# NATIONAL LABOR RELATIONS BOARD *v.* ROBBINS TIRE & RUBBER CO.

No. 77–911.   Argued April 26, 1978—Decided June 15, 1978

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, REHNQUIST, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 243. POWELL, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN, J., joined, *post*, p. 243.

*Carl L. Taylor* argued the cause for petitioner. With him on the brief were *Solicitor General McCree, John S. Irving, Norton J. Come,* and *Carol A. De Deo.*

*William M. Earnest* argued the cause for respondent. With him on the brief was *Charles A. Poellnitz.**

---

*Briefs of *amici curiae* urging affirmance were filed by *Stephen A. Bokat* and *Stanley T. Kaleczyc* for the Chamber of Commerce of the United States; by *Robert E. Williams, Douglas S. McDowell,* and *Frank C. Morris, Jr.,* for the Equal Employment Advisory Council; and by *Alan B. Morrison* for the Freedom of Information Clearinghouse.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

The question presented is whether the Freedom of Information Act (FOIA), 5 U. S. C. § 552 (1976 ed.), requires the National Labor Relations Board to disclose, prior to its hearing on an unfair labor practice complaint, statements of witnesses whom the Board intends to call at the hearing. Resolution of this question depends on whether production of the material prior to the hearing would "interfere with enforcement proceedings" within the meaning of Exemption 7 (A) of FOIA, 5 U. S. C. § 552 (b)(7)(A) (1976 ed.).

I

Following a contested representation election in a unit of respondent's employees, the Acting Regional Director of the NLRB issued an unfair labor practice complaint charging respondent with having committed numerous violations of § 8 (a)(1) of the National Labor Relations Act (NLRA), 29 U. S. C. § 158 (a)(1), during the pre-election period.[1] A hearing on the complaint was scheduled for April 27, 1976. On March 31, 1976, respondent wrote to the Acting Regional Director and requested, pursuant to FOIA, that he make available for inspection and copying, at least seven days prior to the hearing, copies of all potential witnesses' statements collected during the Board's investigation. The Acting Regional Director denied this request on April 2, on the ground that this material was exempt from the disclosure requirements of

---

[1] After investigating the union's objections to the election, the Acting Regional Director not only issued an unfair labor practice charge but also recommended that seven challenged ballots be counted and, if they did not result in the union's receiving a majority, that a hearing be held on certain of the union's objections. The Board adopted the Acting Regional Director's recommendations and, when a count of the challenged ballots failed to give the union a majority, the hearing on its objections to the election was consolidated with the hearing on the unfair labor practice charge.

FOIA by various provisions of the Act, see 5 U. S. C. §§ 552 (b)(5), (7)(A), (C), (D) (1976 ed.). He placed particular reliance on Exemption 7 (A), which provides that disclosure is not required of "matters that are . . . investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would . . . interfere with enforcement proceedings." 5 U. S. C. § 552 (b)(7)(A) (1976 ed.).

Respondent appealed to the Board's General Counsel. Before expiration of the 20-day period within which FOIA requires such appeals to be decided, 5 U. S. C. § 552 (a)(6) (A)(ii) (1976 ed.), respondent filed this action in the United States District Court for the Northern District of Alabama, pursuant to 5 U. S. C. § 552 (a)(4)(B) (1976 ed.). The complaint sought not only disclosure of the statements, but also a preliminary injunction against proceeding with the unfair labor practice hearing pending final adjudication of the FOIA claim and a permanent injunction against holding the hearing until the documents had been disclosed. At argument in the District Court, the Board contended, *inter alia,* that these statements were exempt from disclosure under Exemption 7 (A), because their production would "interfere" with a pending enforcement proceeding. The District Court held that, since the Board did not claim that release of the documents at issue would pose any unique or unusual danger of interference with this particular enforcement proceeding, Exemption 7 (A) did not apply. App. 62, 91. It therefore directed the Board to provide the statements for copying on or before April 22, 1976, or at least five days before any hearing where the person making the statement would be called as a witness.

On the Board's appeal, the United States Court of Appeals for the Fifth Circuit commenced its discussion by observing that while "[t]his is a [FOIA] case, . . . it takes on the troubling coloration of a dispute about the discovery rights . . .

in [NLRB] proceedings." 563 F. 2d 724, 726 (1977).[2] It concluded first that the legislative history of certain amendments to FOIA in 1974 demonstrated that Exemption 7 (A) was to be available only where there was a specific evidentiary showing of the possibility of actual interference in an individual case. *Id.*, at 728. It therefore framed the Exemption 7 (A) issue as "whether pre-hearing disclosure of the contents of statements made by those prepared to testify in support of the Board's case would actually 'interfere' with the Board's case." *Id.*, at 727.

In addressing this question, the Court of Appeals rejected the Board's argument that the premature revelation of its case that would flow from production of the statements prior to the hearing was the kind of "interference" that would justify nondisclosure under the 1974 amendments. Reasoning that the only statements sought were those of witnesses whose prior statements would, under the Board's own rules, be disclosed to respondent following the witnesses' hearing testimony, the court also rejected as inapplicable the argument that potential witnesses would refrain from giving statements at all if pre-hearing disclosure were available. *Id.*, at 729–731. Finally, while the Court of Appeals agreed with the Board that there was "some risk of interference . . . in the form of witness intimidation" during the five-day period between disclosure and the hearing under the District Court's order, it held that the Board had failed to sustain its burden of demonstrating the availability of Exemption 7 (A), because it had "introduced [no] evidence tending to show that this kind of intimidation"

---

[2] As a preliminary matter, the Court of Appeals rejected the Board's argument that the District Court had, in effect, granted an injunction against the Board proceeding, thereby erroneously refusing to require respondent to exhaust its administrative remedies. The court concluded that the District Court had not enjoined the Board proceeding, but had simply conditioned its right to proceed on the Board's complying with respondent's discovery request. 563 F. 2d, at 727.

was in fact likely to occur in this particular case. *Id.*, at 732. Rejecting the Board's other claimed bases of exemption,[3] the Court of Appeals affirmed.

The Board filed a petition for a writ of certiorari, seeking review, *inter alia,*[4] of the Exemption 7 (A) ruling below, on the ground that the decision was in conflict with the weight of Circuit authority that had followed the lead of the United States Court of Appeals for the Second Circuit in *Title Guarantee Co.* v. *NLRB,* 534 F. 2d 484, cert. denied, 429 U. S. 834 (1976).[5] There, on similar facts, the court held that

---

[3] The Board argued that the statements were within the "attorney-work-product" privilege embodied in Exemption 5, which applies to "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U. S. C. § 552 (b) (5) (1976 ed.). The Court of Appeals concluded, however, that the witnesses' statements were neither "memorandums" nor "letters" within the meaning of Exemption 5. The Board also suggested that the statements were covered by Exemption 7 (C) or (D), which apply to "investigatory records compiled for law enforcement purposes," to the extent that their production would "constitute an unwarranted invasion of personal privacy [or] disclose the identity of a confidential source . . . ." The Court of Appeals rejected these claims, noting first that there is "nothing unusual in the nature of personal or family details in these affidavits" that would bring them within the scope of Exemption 7 (C). 563 F. 2d, at 733. With respect to Exemption 7 (D), the court concluded that the Board had failed to prove that the statements sought had been given only by one receiving an assurance of confidentiality. and that it could not so prove since the only statements sought were of witnesses scheduled to testify at the trial. *Id.*, at 733–734.

[4] The second question in the Board's petition for certiorari seeks review of the holding below that Exemption 5 did not protect these witnesses' statements from disclosure. See n. 3, *supra.* In light of our disposition of the case in the Board's favor on the basis of our interpretation of Exemption 7, we have no occasion to address the Exemption 5 question.

[5] Those decisions that have followed *Title Guarantee* include *New England Medical Center Hospital* v. *NLRB,* 548 F. 2d 377 (CA1 1976); *Roger J. Au & Son* v. *NLRB,* 538 F. 2d 80 (CA3 1976); *NLRB* v. *Hardeman Garment Corp.,* 557 F. 2d 559 (CA6 1977); *Abrahamson Chrysler-Plymouth, Inc.* v. *NLRB,* 561 F. 2d 63 (CA7 1977); *Harvey's*

statements of employees and union representatives obtained
in an NLRB investigation leading to an unfair labor practice
charge were exempt from disclosure under Exemption 7 (A)
until the completion of all reasonably foreseeable adminis-
trative and judicial proceedings on the charge. Rejecting the
employer's contention that the Board must make a particu-
larized showing of likely interference in each individual case,
the Second Circuit found that such interference would "neces-
sarily" result from the production of the statements. 534 F.
2d, at 491.

We granted certiorari to resolve the conflict among the
Circuits on this important question of federal statutory law.
434 U. S. 1061 (1978). We now reverse the judgment of the
Fifth Circuit.

## II

We have had several occasions recently to consider the
history and purposes of the original FOIA of 1966. See *EPA
v. Mink,* 410 U. S. 73, 79–80 (1973); *Renegotiation Board* v.
*Bannercraft Clothing Co.,* 415 U. S. 1 (1974); *NLRB* v. *Sears,
Roebuck & Co.,* 421 U. S. 132 (1975); *Department of Air
Force* v. *Rose,* 425 U. S. 352 (1976). As we have repeatedly
emphasized, "the Act is broadly conceived," *EPA* v. *Mink,
supra,* at 80, and its "basic policy" is in favor of disclosure,
*Department of Air Force* v. *Rose, supra,* at 361. In 5 U. S. C.
§ 552 (b) (1976 ed.), Congress carefully structured nine
exemptions from the otherwise mandatory disclosure require-
ments in order to protect specified confidentiality and privacy

---

*Wagon Wheel, Inc.* v. *NLRB,* 550 F. 2d 1139 (CA9 1976); *Climax Molyb-
denum Co.* v. *NLRB,* 539 F. 2d 63 (CA10 1976). In a case involving
witnesses' statements obtained during a pending Equal Employment
Opportunity Commission investigation, the Fourth Circuit has recently
followed the basic approach of the Fifth Circuit in this case and rejected
the *Title Guarantee* rationale. *Charlotte-Mecklenburg Hospital Authority*
v. *Perry,* 571 F. 2d 195 (1978).

interests.[6]   But unless the requested material falls within one of these nine statutory exemptions, FOIA requires that records and material in the possession of federal agencies be made available on demand to any member of the general public.

Exemption 7 as originally enacted permitted nondisclosure of "investigatory files compiled for law enforcement purposes except to the extent available by law to a private party."   80

---

[6] Section 552 (b) in its entirety provides:

"This section does not apply to matters that are—

"(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

"(2) related solely to the internal personnel rules and practices of an agency;

"(3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

"(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

"(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

"(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

"(7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel;

"(8) contained in or related to examination, operating, or condition

Stat. 251. In 1974, this exemption was rewritten to permit the nondisclosure of "investigatory records compiled for law enforcement purposes," but only to the extent that producing such records would involve one of six specified dangers. The first of these, with which we are here concerned, is that production of the records would "interfere with enforcement proceedings."

The Board contends that the original language of Exemption 7 was expressly designed to protect existing NLRB policy forbidding disclosure of statements of prospective witnesses until after they had testified at unfair labor practice hearings. In its view, the 1974 amendments preserved Congress' original intent to protect witness statements in unfair labor practice proceedings from premature disclosure, and were directed primarily at case law that had applied Exemption 7 too broadly to cover any material, regardless of its nature, in an investigatory file compiled for law enforcement purposes. The Board urges that a particularized, case-by-case showing is neither required nor practical, and that witness statements in pending unfair labor practice proceedings are exempt as a matter of law from disclosure while the hearing is pending.

Respondent disagrees with the Board's analysis of the 1974 amendments. It argues that the legislative history conclusively demonstrates that the determination of whether disclosure of any material would "interfere with enforcement proceedings" must be made on an individual, case-by-case basis. While respondent agrees that the statements sought

---

reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

"(9) geological and geophysical information and data, including maps, concerning wells.

"Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."

here are "investigatory files compiled for law enforcement purposes," and that they are related to an imminent enforcement proceeding, it argues that the Board's failure to make a specific factual showing that their release would interfere with this proceeding defeats the Board's Exemption 7 claim.

## A

The starting point of our analysis is with the language and structure of the statute. We can find little support in the language of the statute itself for respondent's view that determinations of "interference" under Exemption 7 (A) can be made only on a case-by-case basis. Indeed, the literal language of Exemption 7 as a whole tends to suggest that the contrary is true. The Exemption applies to:

> "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel."

There is a readily apparent difference between subdivision (A) and subdivisions (B), (C), and (D). The latter subdivisions refer to particular cases—"a person," "an unwarranted invasion," "a confidential source"—and thus seem to require a showing that the factors made relevant by the statute are present in each distinct situation. By contrast, since subdivision (A) speaks in the plural voice about "enforcement

proceedings," it appears to contemplate that certain generic determinations might be made.

Respondent points to other provisions of FOIA in support of its interpretation. It suggests that, because FOIA expressly provides for disclosure of segregable portions of records and for *in camera* review of documents, and because the statute places the burden of justifying nondisclosure on the Government, 5 U. S. C. §§ 552 (a)(4)(B), (b) (1976 ed.), the Act necessarily contemplates that the Board must specifically demonstrate in each case that disclosure of the particular witness' statement would interfere with a pending enforcement proceeding. We cannot agree. The *in camera* review provision is discretionary by its terms, and is designed to be invoked when the issue before the District Court could not be otherwise resolved; it thus does not mandate that the documents be individually examined in every case. Similarly, although the segregability provision requires that nonexempt portions of documents be released, it does not speak to the prior question of what material is exempt. Finally, the mere fact that the burden is on the Government to justify nondisclosure does not, in our view, aid the inquiry as to what kind of burden the Government bears.

We thus agree with the parties that resolution of the question cannot be achieved through resort to the language of the statute alone. Accordingly, we now turn to an examination of the legislative history.

## B

In originally enacting Exemption 7, Congress recognized that law enforcement agencies had legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it came time to present their cases. Foremost among the purposes of this Exemption was to prevent "harm [to] the Government's case in court," S. Rep. No. 813, 89th Cong., 1st Sess. (1965), reprinted in Freedom of Information Act Source Book, Sub-

committee on Administrative Practice & Procedure, Senate Judiciary Committee, S. Doc. No. 93–82, p. 44 (1974) (hereinafter cited as 1974 Source Book), by not allowing litigants "earlier or greater access" to agency investigatory files than they would otherwise have, H. R. Rep. No. 1497, 89th Cong., 2d Sess. (1966), reprinted in 1974 Source Book 32. Indeed, in an unusual, post-passage reconsideration vote, the Senate modified the language of this Exemption specifically to meet Senator Humphrey's concern that it might be construed to require disclosure of "statements of agency witnesses" prior to the time they were called on to testify in agency proceedings. *Id.*, at 110.

Senator Humphrey was particularly concerned that the initial version of the Exemption passed by the Senate might be "susceptible to the interpretation that once a complaint of unfair labor practice is filed by the General Counsel of the NLRB, access could be had to the statements of all witnesses, whether or not these statements are relied upon to support the complaint." *Ibid.* He argued against this, noting that "[w]itnesses would be loath to give statements if they knew that their statements were going to be made known to the parties before the hearing," *id.*, at 111, and proposed adding another exemption to make clear that "statements of agency witnesses" would be exempt "until such witnesses are called to testify in an action or proceeding," *id.*, at 110.[7] In direct response to what he described as Senator Humphrey's "valu-

---

[7] Senator Humphrey's amendment would have exempted from disclosure "statements of agency witnesses until such witnesses are called to testify in an action or proceeding and request is timely made by a private party for the production of relevant parts of such statements for purposes of cross examination." 1974 Source Book 110. Colloquy on the floor made clear that the Senators thought it desirable to extend the so-called "Jencks" rule to agency proceedings, requiring the disclosure of witnesses' statements only after the witnesses testified at the agency proceedings. See *id.*, at 111.

able suggestion," Senator Long offered an amendment resulting in the version of Exemption 7 actually passed in 1966, which Senator Humphrey agreed would "take care of the situation." *Id.,* at 111.

In light of this history, the Board is clearly correct that the 1966 Act was expressly intended to protect against the mandatory disclosure through FOIA of witnesses' statements prior to an unfair labor practice proceeding. From one of the first reported decisions under FOIA, *Barceloneta Shoe Corp.* v. *Compton,* 271 F. Supp. 591 (PR 1967), through the time of the 1974 amendments, the courts uniformly recognized this purpose. Thus, in *Wellman Industries, Inc.* v. *NLRB,* 490 F. 2d 427 (CA4), cert. denied, 419 U. S. 834 (1974), the Court of Appeals held that affidavits obtained by an NLRB investigator during an inquiry into union objections to a representation election, which ultimately led to the filing of an unfair labor practice charge, were exempt from disclosure sought by the employer prior to the hearing on the complaint. It noted that employees might become unwilling to make " 'uninhibited and non-evasive statement[s]' " if disclosure were granted, 490 F. 2d, at 431, quoting *NLRB* v. *National Survey Service, Inc.,* 361 F. 2d 199, 206 (CA7 1966), and emphasized that application of the exemption was "necessary in order to prevent premature disclosure of an investigation so that the Board can present its strongest case in court." 490 F. 2d, at 431. Accord, *NLRB* v. *Clement Bros. Co.,* 407 F. 2d 1027, 1031 (CA5 1969).

## C

In 1974 Congress acted to amend FOIA in several respects. The move to amend was prompted largely by congressional disapproval of our decision in *EPA* v. *Mink,* 410 U. S. 73 (1973), regarding the availability of *in camera* review of classified documents. Congress was also concerned that administrative agencies were being dilatory in complying with the

spirit of the Act and with court decisions interpreting FOIA to mandate disclosure of information to the public. See, *e. g.,* Administration of the Freedom of Information Act, H. R. Rep. No. 92–1419 (1972),[8] reprinted in 1975 Source Book 18, 79–80. As the amending legislation was reported out of the respective Committees, no change in Exemption 7 was recommended. See n. 14, *infra.* The 1974 amendment of Exemption 7 resulted instead from a proposal on the floor by Senator Hart during Senate debate.

Senator Hart, in introducing his floor amendment, noted that the original intent of the 1966 Congress "was to prevent harm to the Government's case in court by not allowing an opposing litigant earlier or greater access to investigatory files than he would otherwise have." 1975 Source Book 332. He indicated his continued agreement with this purpose, *id.,* at 333, but stated that recent court decisions had gone beyond this original intent by shielding from disclosure information that Congress had not intended to protect. Senator Hart emphasized his concern that "material cannot be and ought not be exempt merely because it can be categorized as an investigatory file compiled for law enforcement purposes." *Ibid.*

In colloquy with Senator Kennedy on the floor, Senator Hart stated specifically, *id.,* at 349, that the amendment's purpose was to respond to four decisions of the District of

---

[8] This 89-page Report resulted from several days of hearings held by the House Government Operations Committee. Its focus was primarily on the procedural aspects of FOIA, and it manifested little discontent with the substantive disclosure and exemption requirements of the Act. See Administration of the Freedom of Information Act, H. R. Rep. No. 92–1419 (1972), reprinted in House Committee on Government Operations and Senate Committee on the Judiciary, Freedom of Information Act and Amendments of 1974 (Pub. L. 93–502) Source Book, 94th Cong., 1st Sess., 15 (Joint Comm. Print 1975) (identification of "major problem areas") (hereinafter cited as 1975 Source Book).

Columbia Circuit,[9] commencing with the en banc decision in *Weisberg* v. *United States Dept. of Justice,* 160 U. S. App. D. C. 71, 489 F. 2d 1195 (1973), cert. denied, 416 U. S. 993 (1974). There, the plaintiff had sought disclosure of certain material in investigatory files relating to the assassination of President Kennedy, files that had been compiled 10 years before. Although the court acknowledged that no enforcement proceedings were then pending or contemplated, it held that all the agency need show to be entitled to withhold under Exemption 7 was that the records were investigatory in nature and had been compiled for law enforcement purposes. 160 U. S. App. D. C., at 74, 489 F. 2d, at 1198. The court adhered to this holding in *Aspin* v. *Department of Defense,* 160 U. S. App. D. C. 231, 237, 491 F. 2d 24, 30 (1973), stating that even "after the termination of investigation and enforcement proceedings," material found in an investigatory file is entirely exempt. In *Ditlow* v. *Brinegar,* 161 U. S. App. D. C. 154, 494 F. 2d 1073 (1974), the court indicated that, after *Weisberg,* the only question before it was whether the requested material was found in an investigatory file compiled for law enforcement purposes. Finally, in *Center for National Policy Review on Race and Urban Issues* v. *Weinberger,* 163 U. S. App. D. C. 368, 502 F. 2d 370 (1974), the court held that the investigatory file exemption was available even if an enforcement proceeding

---

[9] In response to Senator Hruska's remarks that the amendment of Exemption 7 was likely to result in lawlessness due to ineffective law enforcement activities, Senator Kennedy stated that there had "been a gross misinterpretation of the actual words of the amendment and its intention." 1975 Source Book 349. In order "for the record to be extremely clear," he continued, what the amendment sought to do was "be specific about safeguarding . . . legitimate investigations . . . by the Federal agencies." He then asked Senator Hart whether its "impact and effect [was] to override" the four decisions discussed in the text. *Ibid.* The Conference Report on the 1974 amendments similarly states that the Exemption 7 amendment was designed to clarify Congress' intent to disapprove of certain court decisions. *Id.,* at 229.

were neither imminent nor likely either at the time of the compilation or at the time disclosure was sought. These four cases, in Senator Hart's view, erected a "stone wall" against public access to any material in an investigatory file. 1975 Source Book 332.[10]

Senator Hart believed that his amendment would rectify these erroneous judicial interpretations and clarify Congress' original intent in two ways. First, by substituting the word "records" for "files," it would make clear that courts had to consider the nature of the particular document as to which exemption was claimed, in order to avoid the possibility of

---

[10] Although much of the debate on this amendment focused on the problems of access to "closed files," two of the four D. C. Circuit cases involved files in still-pending investigations. *Ditlow* v. *Brinegar; Center for National Policy Review of Race and Urban Issues* v. *Weinberger*. But we do not understand the thrust of the Board's argument to depend solely on its file being "open." Instead, the Board points to the particular nature of these proceedings and the imminence of an actual adjudicatory proceeding on the charge. Since Senators Kennedy and Hart carefully explained the amendment's purpose as being to eliminate a "wooden" and overly literal approach to the language of the Exemption, we do not read their reference to these two cases to mean that consideration of the pendency of an as-yet-unresolved charge to which the material sought relates is a factor that cannot be considered.

Assuming, *arguendo,* that the references to *Ditlow* and *Weinberger* mean that Congress disapproved of their holdings, as well as their reasoning, we do not think this disapproval undercuts our conclusion that the records sought here are protected. In *Ditlow,* Exemption 7 was held to protect correspondence between automobile manufacturers and the National Highway Safety Traffic Administration concerning an apparently extended investigation of possible defects. Similarly, in *Weinberger,* Exemption 7 protection was extended to material in investigatory files of the Department of Health, Education, and Welfare relating to desegregation of the public schools in the North. In each of these cases, no enforcement proceeding was contemplated, much less imminent. Here, by contrast, an imminent adjudicatory proceeding is involved, in which the special dangers of interference with enforcement proceedings from prehearing disclosure are necessarily of a finite duration.

impermissible "commingling" by an agency's placing in an investigatory file material that did not legitimately have to be kept confidential. *Id.*, at 451. Second, it would explicitly enumerate the purposes and objectives of the Exemption, and thus require reviewing courts to "loo[k] to the reasons" for allowing withholding of investigatory files before making their decisions. *Id.*, at 334. The "woode[n] and mechanica[l]" approach taken by the D. C. Circuit and disapproved by Congress would thereby be eliminated. *Id.*, at 335 (remarks of Sen. Kennedy). As Congressman Moorhead explained to the House, the Senate amendment was needed to address "recent court decisions" that had applied the exemptions to investigatory files "even if they ha[d] long since lost any requirement for secrecy." *Id.*, at 378.

Thus, the thrust of congressional concern in its amendment of Exemption 7 was to make clear that the Exemption did not endlessly protect material simply because it was in an investigatory file. Although, as indicated previously, no change in this section was reported out of committee, both Senate and House Committees had considered proposals to amend the provision.[11] The Hart amendment was identical in respects

---

[11] Both S. 1142 and H. R. 5425, as introduced in the 93d Congress, would have amended Exemption 7 to read as follows:

" '(7) investigatory records compiled for any specific law-enforcement purpose the disclosure of which is not in the public interest, except to the extent that—

" '(A) any such investigatory records are available by law to a party other than an agency, or

" '(B) any such investigatory records are—

" '(i) scientific tests, reports, or data.

" '(ii) inspection reports of any agency which relate to health, safety, environmental protection, or

" '(iii) records which serve as a basis for any public policy statement made by any agency or officer or employee of the United States or which serve as a basis for rulemaking by any agency.' "

See 1 Hearings on S. 858 et al. before the Subcommittee on Intergovern-

here relevant to a proposal submitted during the hearings by the Administrative Law Division of the American Bar Association.[12]   2 Senate Hearings 158.   The purpose of this proposal,

---

mental Relations of the Senate Committee on Government Operations and the Subcommittees on Separation of Powers and Administrative Practice and Procedure of the Senate Committee on the Judiciary, 93d Cong., 1st Sess., 507 (1973) (hereinafter Senate Hearings); Hearings on H. R. 5425 et al. before a Subcommittee of the House Committee on Government Operations, 93d Cong., 1st Sess., 7 (1973) (hereinafter House Hearings).   In addition, H. R. 4960 would have amended the Exemption with the following language:

"investigatory records complied [sic] for law enforcement purposes, but only to the extent that production of such records would constitute (A) a genuine risk to enforcement proceedings.   (B) a clearly unwarranted invasion of personal privacy, or (c) [sic] a threat to life." House Hearings 12.

The hearings on these proposals reflected Senator Hart's concern that the courts were applying the language of the Exemption too literally and without regard for its underlying purposes.   One witness from the American Civil Liberties Union, for example, emphasized that "[w]hat is being gotten at here . . . is the old investigatory files, the dead files, the files that are yellowing in the Justice Department and the FBI . . . ."   2 Hearings on S. 1142 et al. before the Subcommittees on Administrative Practice and Procedure and Separation of Powers of the Senate Judiciary Committee and the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 93d Cong., 1st Sess., 40 (1973) (hereinafter cited as 2 Senate Hearings) (statement of John Shattuck, ACLU staff counsel).   See also House Hearings 28 (remarks of Rep. Erlenborn); id., at 78 (remarks of Rep. Horton).   Senator Kennedy at one point proposed an amendment that would protect only actively pending cases, 2 Senate Hearings 2; the proposal was similar to a Justice Department proposal that would exempt all files in pending cases, and closed files but to a more limited extent.   Id., at 227.

[12] The ABA proposal exempted:

"Investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) disclose the identity of an

according to the Chairman of the ABA Administrative Law Division, was to indicate that "with passage of time, . . . when the investigation is all over and the purpose and point of it has expired, it would no longer be an interference with enforcement proceedings and there ought to be disclosure." *Id.,* at 149. The tenor of this description of the statutory language clearly suggests that the release of information in investigatory files prior to the completion of an actual, contemplated enforcement proceeding was precisely the kind of interference that Congress continued to want to protect against. Indeed, Senator Hart stated specifically that Exemption 7 (A) would apply "whenever the Government's case in court— a concrete prospective law enforcement proceeding—would be harmed by the premature release of evidence or information . . . ." 1975 Source Book 333.

That the 1974 Congress did not mean to undercut the intent of the 1966 Congress with respect to Senator Humphrey's concern about interference with pending NLRB enforcement proceedings is apparent from the emphasis that both Senators Kennedy and Hart, the leaders in the debate on Exemption 7, placed on the fact that the amendment represented no radical departure from prior case law. While the D. C. Circuit decisions discussed above were repeatedly mentioned and condemned in the debates, nowhere do the floor debates or

---

informer, or (D) disclose investigative techniques and procedures." *Id.,* at 158.

The Hart amendment, proposed on the floor, incorporated most of this language and all of the language found in Exemption 7 (A):

"Investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication or constitute a clearly unwarranted invasion of personal privacy, (C) disclose the identity of an informer, or (D) disclose investigative techniques and procedures."

After passing the Senate in this form, the amendment was modified to its present form, see *supra,* at 223, in Conference Committee.

Committee Reports condemn the decisions holding that Exemption 7 protected witnesses' statements in pending NLRB proceedings from disclosure, see *supra*, at 226, although Congress was clearly aware of these decisions.[13] As Senator Hart concluded in his introductory remarks in support of the amendment:

> "This amendment is by no means a radical departure from existing case law under the Freedom of Information Act. Until a year ago the courts looked to the reasons for the seventh exemption before allowing the withholding of documents. That approach is in keeping with the intent of Congress and by this amendment we wish to reinstall it as the basis for access to information." 1975 Source Book 334.[14]

---

[13] Congress had prepared for its use a detailed case summary of the first 200 decisions under FOIA, see 1974 Source Book 116–183, a summary that included such cases as *Barceloneta Shoe Corp.* v. *Compton*, 271 F. Supp. 591 (PR 1967), and *NLRB* v. *Clement Bros. Co.*, 407 F. 2d 1027 (CA5 1969), discussed *supra*, at 226. *Wellman Industries, Inc.* v. *NLRB*, 490 F. 2d 427 (CA4), cert. denied, 419 U. S. 834 (1974), followed the holdings of these two earlier decisions, but was apparently decided after the case summary was prepared and is not cited therein.

[14] Senator Hart's comments are in accord with Senator Kennedy's explanation of why the Committees, after considering similar proposals to amend Exemption 7, see n. 11, *supra*, failed to report out an amendment. Senator Kennedy stated that the Committees had concluded that the courts were, by and large, giving that Exemption an appropriately narrow construction, and that any amendment of the Exemption would serve only to create confusion. See 1975 Source Book 335; S. Rep. No. 93-854 (1974), reprinted in 1975 Source Book 159. Senator Kennedy then stated that in light of the recent series of cases in the last 9–12 months, the "initial appraisal" of the case law had "turned out to be short lived." *Id.*, at 335.

The Senator may have been mistaken as to the year of the first decision extending Exemption 7 protection automatically even in closed-file cases. In *Frankel* v. *SEC*, 460 F. 2d 813 (CA2 1972), over the strong dissent of Judge Oakes (the author of the later *Title Guarantee* opinion), the court held that material in an investigatory file was exempt from

Senator Kennedy confirmed that "by accepting [this] amendment we will be reemphasizing and clarifying what the law presently requires." *Id.*, at 336. The emphasis that was placed on the limited scope of the amendment makes it more than reasonable to conclude that Congress intended to preserve existing law relating to NLRB proceedings—case law that had looked to the "reasons" for the Exemption and found them to be present where an unfair labor practice proceeding was pending and the documents sought were potential witnesses' statements.

## D

In the face of this history, respondent relies on Senator Hart's floor statement that "it is only relevant" to determine whether an interference would result "in the context of the particular enforcement proceeding." *Id.*, at 333. Respondent argues that this statement means that in each case the court must determine whether the material of which disclosure is sought would actually reveal the Government's case prematurely, result in witness intimidation, or otherwise create a demonstrable interference with the particular case.

We believe that respondent's reliance on this statement is misplaced. Although Congress could easily have required in so many words that the Government in each case show a particularized risk to its individual "enforcement proceedin[g]," it did not do so; [15] the statute, if anything, seems to draw a distinction in this respect between subdivision (A) and subdivisions (B), (C), and (D), see *supra*, at 223–224. Senator Hart's words are ambiguous, moreover, and must be

disclosure even though the investigation was complete and no enforcement proceedings were pending. Given the long history of cases construing NLRB witness statements as nondisclosable, see *supra*, at 226, we may assume that these decisions were not the object of the Senator's amendment.

[15] Indeed, Congress failed to enact proposals that might have had this effect. See n. 11, *supra*.

read in light of his primary concern: that by extending blanket protection to anything labeled an investigatory file, the D. C. Circuit had ignored Congress' original intent. His remarks plainly do not preclude a court from considering whether "particular" *types* of enforcement proceedings, such as NLRB unfair labor practice proceedings, will be interfered with by particular types of disclosure.

Respondent also relies on President Ford's message accompanying his veto of this legislation, and on the debate which led to Congress' override of the veto. The President's primary concern was with the congressional response to this Court's decision in *EPA* v. *Mink,* 410 U. S. 73 (1973), concerning *in camera* judicial review of classified documents under Exemption 1. In addition, however, the President cited what in his view were the onerous new requirements of Exemption 7 that would require the Government to "prove . . .—separately for each paragraph of each document—that disclosure 'would' cause" a specific harm. 1975 Source Book 484. The leading supporters of the 1974 amendments, however, did not accept the President's characterization; instead they indicated, with regard to the amended Exemption 7, that the President's suggestions were "ludicrous," *id.,* at 406 (remarks of Rep. Moorhead), and that the "burden is substantially less than we would be led to believe by the President's message," *id.,* at 450 (remarks of Sen. Hart).

What Congress clearly did have in mind was that Exemption 7 permit nondisclosure only where the Government "specif[ies]" that one of the six enumerated harms is present, *id.,* at 413 (remarks of Rep. Reid), and the court, reviewing the question *de novo,* agrees that one of those six "reasons" for nondisclosure applies. See *supra,* at 232. Thus, where an agency fails to "demonstrat[e] that the . . . documents [sought] relate to any ongoing investigation or . . . would jeopardize any future law enforcement proceedings," Exemption 7 (A) would not provide protection to the agency's decision. 1975

Source Book 440 (remarks of Sen. Kennedy). While the Court of Appeals was correct that the amendment of Exemption 7 was designed to eliminate "blanket exemptions" for Government records simply because they were found in investigatory files compiled for law enforcement purposes, we think it erred in concluding that no generic determinations of likely interference can ever be made. We conclude that Congress did not intend to prevent the federal courts from determining that, with respect to particular kinds of enforcement proceedings, disclosure of particular kinds of investigatory records while a case is pending would generally "interfere with enforcement proceedings."

## III

The remaining question is whether the Board has met its burden of demonstrating that disclosure of the potential witnesses' statements at this time "would interfere with enforcement proceedings." A proper resolution of this question requires us to weigh the strong presumption in favor of disclosure under FOIA against the likelihood that disclosure at this time would disturb the existing balance of relations in unfair labor practice proceedings, a delicate balance that Congress has deliberately sought to preserve and that the Board maintains is essential to the effective enforcement of the NLRA. Although reasonable arguments can be made on both sides of this issue, for the reasons that follow we conclude that witness statements in pending unfair labor practice proceedings are exempt from FOIA disclosure at least until completion of the Board's hearing.

Historically, the NLRB has provided little prehearing discovery in unfair labor practice proceedings and has relied principally on statements such as those sought here to prove its case. While the NLRB's discovery policy has been criticized, the Board's position that § 6 of the NLRA, 29 U. S. C. § 156, commits the formulation of discovery practice to its

discretion has generally been sustained by the lower courts.[16]
A profound alteration in the Board's trial strategy in unfair
labor practice cases would thus be effectuated if the Board
were required, in every case in which witnesses' statements
were sought under FOIA prior to an unfair labor practice
proceeding, to make a particularized showing that release of
these statements would interfere with the proceeding.[17]

Not only would this change the substantive discovery rules,
but it would do so through mechanisms likely to cause sub-
stantial delays in the adjudication of unfair labor practice

[16] Section 6 of the NLRA provides that the Board may "make such
rules and regulations as may be necessary to carry out the provisions of
this Act." Most Circuits have held that prehearing discovery questions
are committed to the Board's discretion. See, e. g., NLRB v. Vapor
Blast Mfg. Co., 287 F. 2d 402 (CA7 1961); Electromec Design & Develop-
ment Co. v. NLRB, 409 F. 2d 631, 635 (CA9 1969); NLRB v. Interboro
Contractors, Inc., 432 F. 2d 854, 858 (CA2 1970), cert. denied, 402 U. S.
915 (1971); D'Youville Manor, Lowell, Mass., Inc. v. NLRB, 526 F. 2d
3, 7 (CA1 1975); NLRB v. Valley Mold Co., 530 F. 2d 693, 695 (CA6
1976).

Contrary to these authorities, the Fifth Circuit has held that "when
good cause is shown [the NLRB] should permit discovery" in unfair
labor practice proceedings. NLRB v. Rex Disposables, 494 F. 2d 588,
592 (1974), citing NLRB v. Safway Steel Scaffolds Co., 383 F. 2d
273 (CA5 1967), cert. denied, 390 U. S. 955 (1968) (relying on § 10 (b)
of the NLRA, 29 U. S. C. § 160 (b)). This view of discovery in Board
proceedings may have influenced the decision of the court below, since it
noted that, under the Fifth Circuit's approach to NLRB discovery,
granting the FOIA request here might not have given the employer any
more information about the Board's case than it could otherwise have
obtained. Since the court below did not rest on this ground, but instead
indicated that the prospect of premature revelation of the Board's case
was not, of itself, an "interference" with enforcement proceedings, see
supra, at 218, we intimate no view as to the validity of the Fifth Circuit's
approach to Board discovery.

[17] If the Court of Appeals' ruling below were not reversed, the Board
anticipated that prehearing requests for witnesses' statements under FOIA
would be made by employer-respondents in virtually all unfair labor prac-
tice proceedings. See Pet. for Cert. 9.

charges.[18]  In addition to having a duty under FOIA to pro-
vide public access to its processess, the NLRB is charged
with the duty of effectively investigating and prosecuting
violations of the labor laws.  See 29 U. S. C. §§ 160, 161.  To
meet its latter duty, the Board can be expected to continue
to claim exemptions with regard to prehearing FOIA discovery
requests, and numerous court contests will thereby ensue.
Unlike ordinary discovery contests, where rulings are generally
not appealable until the conclusion of the proceedings, an
agency's denial of a FOIA request is immediately reviewable
in the district court, and the district court's decision can
then be reviewed in the court of appeals.  The potential for
delay and for restructuring of the NLRB's routine adjudica-
tions of unfair labor practice charges from requests like re-
spondent's is thus not insubstantial.  See n. 17, *supra*.

In the absence of clear congressional direction to the con-
trary, we should be hesitant under ordinary circumstances to
interpret an ambiguous statute to create such dislocations.
Not only is such direction lacking, but Congress in 1966
was particularly concerned that premature production of wit-
nesses' statements in NLRB proceedings would adversely
affect that agency's ability to prosecute violations of the
NLRA, and, as indicated above, the legislative history of the
1974 amendments affords no basis for concluding that Con-

---

[18] We believe that delay of adjudicatory proceedings is a relevant factor,
because Exemption 7 requires us to look at the interference that would
flow from the "production," and not merely the disclosure, of records.
Since Congress had before it proposals that would have exempted only
those investigatory records whose "disclosure" would create specified
harms, see 1975 Source Book 338 (proposal of Assn. of Bar of City
of New York), it is not unreasonable to attribute some significance to the
use of the word "production" as defining the scope of activities from
which the "interferences" justifying nondisclosure might flow.  See also
5 U. S. C. § 552 (b) (6) (1976 ed.) (exempting personnel and medical files
the *"disclosure* of which" would invade privacy) (emphasis added).

gress at that time intended to create any radical departure from prior, court-approved Board practice. See *supra,* at 224–234. Our reluctance to override a long tradition of agency discovery, based on nothing more than an amendment to a statute designed to deal with a wholly different problem, is strengthened by our conclusion that the dangers posed by premature release of the statements sought here would involve precisely the kind of "interference with enforcement proceedings" that Exemption 7 (A) was designed to avoid.

A

The most obvious risk of "interference" with enforcement proceedings in this context is that employers or, in some cases, unions will coerce or intimidate employees and others who have given statements, in an effort to make them change their testimony or not testify at all. This special danger flowing from prehearing discovery in NLRB proceedings has been recognized by the courts for many years, see, *e. g., NLRB* v. *Vapor Blast Mfg. Co.,* 287 F. 2d 402, 407 (CA7), cert. denied, 368 U. S. 823 (1961); *NLRB* v. *National Survey Service, Inc.,* 361 F. 2d 199, 206 (CA7 1966); *NLRB* v. *Lizdale Knitting Mills,* 523 F. 2d 978, 980 (CA2 1975), and formed the basis for Senator Humphrey's particular concern, see *supra,* at 225. Indeed, Congress recognized this danger in the NLRA itself, and provided in § 8 (a)(4) that it is an unfair labor practice for an employer "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter." 29 U. S. C. § 158 (a)(4). See *NLRB* v. *Scrivener,* 405 U. S. 117, 121 (1972). Respondent's argument that employers will be deterred from improper intimidation of employees who provide statements to the NLRB by the possibility of a § 8 (a)(4) charge misses the point of Exemption 7 (A); the possibility of deterrence arising from *post hoc* disciplinary action is no substitute for a prophylactic

rule that prevents the harm to a pending enforcement proceeding which flows from a witness' having been intimidated.[19]

The danger of witness intimidation is particularly acute with respect to current employees—whether rank and file, supervisory, or managerial—over whom the employer, by virtue of the employment relationship, may exercise intense leverage. Not only can the employer fire the employee, but job assignments can be switched, hours can be adjusted, wage and salary increases held up, and other more subtle forms of influence exerted. A union can often exercise similar authority over its members and officers. As the lower courts have recognized, due to the "peculiar character of labor litigation[,] the witnesses are especially likely to be inhibited by fear of the employer's or—in some cases—the union's capacity for reprisal and harassment." *Roger J. Au & Son, Inc.* v. *NLRB,* 538 F. 2d 80, 83 (CA3 1976). Accord, *NLRB* v. *Hardeman Garment Corp.,* 557 F. 2d 559 (CA6 1977). While the risk of intimidation (at least from employers) may be somewhat diminished with regard to statements that are favorable to the employer, those known to have already given favorable statements are then subject to pressure to give even more favorable testimony.

Furthermore, both employees and nonemployees may be reluctant to give statements to NLRB investigators at all, absent assurances that unless called to testify in a hearing, their statements will be exempt from disclosure until the unfair labor practice charge has been adjudicated. Such reluctance may flow less from a witness' desire to maintain complete confidentiality—the concern of Exemption 7 (D)—than from an all too familiar unwillingness to "get too involved" unless

---

[19] Respondent argues that the relatively small percentage of unfair labor practice charges filed under § 8 (a) (4) demonstrates that the Board's justifications for its nondisclosure rules are illusory. Brief for Respondent 38. But the small percentage may reflect the effectiveness of the intimidation, rather than any lack thereof. It may also reflect the success of the Board's current policy.

absolutely necessary. Since the vast majority of the Board's unfair labor practice proceedings are resolved short of hearing, without any need to disclose witness statements, those currently giving statements to Board investigators can have some assurance that in most instances their statements will not be made public (at least until after the investigation and any adjudication is complete).[20]   The possibility that a FOIA-induced change in the Board's prehearing discovery rules will have a chilling effect on the Board's sources cannot be ignored.[21]

In short, prehearing disclosure of witnesses' statements would involve the kind of harm that Congress believed would constitute an "interference" with NLRB enforcement proceedings: that of giving a party litigant earlier and greater access to the Board's case than he would otherwise have.   As the lower courts have noted, even without intimidation or harassment a suspected violator with advance access to the Board's case could " 'construct defenses which would permit violations to go unremedied.' "   *New England Medical Center Hosp.* v. *NLRB,* 548 F. 2d 377, 382 (CA1 1976), quoting *Title Guarantee Co.* v. *NLRB,* 534 F. 2d, at 491.   This possibility arises simply from the fact of prehearing disclosure of any witness

---

[20] According to the Board, 94% of all unfair labor practice charges filed are resolved short of hearing; in the remaining 6% that go to hearing, many potential witnesses are not actually called to testify, since their testimony is cumulative.   Brief for Petitioner 17–18, n. 4.

[21] Respondent argues that the Court of Appeals was correct in concluding that this danger is nonexistent with respect to a witness scheduled to testify, since the Board under its own discovery rules will turn over those statements once the witness has actually testified.   See 29 CFR § 102.118 (b)(1) (1977).   This argument falters, first, on the fact that only those portions of the witness' statements relating to his direct examination or the issues raised in the pleadings are disclosed under the Board's discovery rules.   In addition, to uphold respondent's FOIA request would doubtless require the Board in many cases to turn over statements of persons whom it did not actually call at the adjudicatory hearings.   See n. 20, *supra.*

statements, whether the witness is favorable or adverse, employee or nonemployee. While those drafting discovery rules for the Board might determine that this "interference" is one that should be tolerated in order to promote a fairer decisionmaking process, that is not our task in construing FOIA.

## B

The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed. 1974 Source Book 38; see also *NLRB v. Sears, Roebuck & Co.*, 421 U. S., at 152. Respondent concedes that it seeks those statements solely for litigation discovery purposes, and that FOIA was *not* intended to function as a private discovery tool, see *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U. S., at 22.[22] Most, if not all, persons who have sought prehearing disclosure of Board witnesses' statements have been in precisely this posture—parties respondent in Board proceedings.[23] Since we are dealing here with the narrow question whether witnesses' statements must be released five days prior to an unfair labor practice hearing, we cannot see how FOIA's purposes would be defeated by deferring disclosure until after the Government has "presented its case in court." Cf. *NLRB v. Sears, Roebuck & Co., supra*, at 159–160.

Consideration of the underlying policy of the Act as it applies in this case thus reinforces our conclusion that Congress, having given no explicit attention to this problem in its 1974 legislation, could not have intended to overturn the NLRB's longstanding rule against prehearing disclosure of

---

[22] Tr. of Oral Arg. 31, 34.

[23] This is not to suggest that respondent's rights are in any way diminished by its being a private litigant, but neither are they enhanced by respondent's particular, litigation-generated need for these materials. See *EPA v. Mink*, 410 U. S. 73, 86 (1973).

witness statements. It was Congress' understanding, and it is our conclusion, that release of such statements necessarily "would interfere" in the statutory sense with the Board's "enforcement proceedings." We therefore conclude that the Court of Appeals erred in holding that the Board was not entitled to withhold such statements under Exemption 7 (A).

The judgment of the Court of Appeals is, accordingly,

*Reversed.*

MR. JUSTICE STEVENS, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, concurring.

The "act of meddling in" a process is one of Webster's accepted definitions of the word "interference."* A statute that authorized discovery greater than that available under the rules normally applicable to an enforcement proceeding would "interfere" with the proceeding in that sense. The Court quite correctly holds that the Freedom of Information Act does not authorize any such interference in Labor Board enforcement proceedings. Its rationale applies equally to any enforcement proceeding. On that understanding, I join the opinion.

MR. JUSTICE POWELL, with whom MR. JUSTICE BRENNAN joins, concurring in part and dissenting in part.

I join the Court's opinion to the extent that it holds that Exemption 7 (A) of the Freedom of Information Act (Act or FOIA), 5 U. S. C. § 552 (b)(7)(A) (1976 ed.), permits the federal courts to determine that "with respect to particular kinds of enforcement proceedings, disclosure of particular kinds of investigatory records while a case is pending would generally 'interfere with enforcement proceedings.' " *Ante*, at 236.

---

*One of the definitions of "interference" is "the act of meddling in or hampering an activity or process." Webster's Third New International Dictionary 1178 (1961).

I endorse the limitation of such "generic determinations of likely interference," *ibid.*, to "an imminent adjudicatory proceeding" that is "necessarily of a finite duration," *ante,* at 229 n. 10. I also agree that the National Labor Relations Board (Board) has sustained its burden of justifying nondisclosure of statements by current employees that are unfavorable to their employer's cause in an unfair labor practice proceeding against that employer. But I cannot accept the Court's approval of the application of the Board's rule of nondisclosure to *all* witness statements, unless and until a witness gives direct testimony before an administrative law judge. And I disagree with the Court's apparent interpretation of Exemption 7 (A) as providing no "earlier or greater access" to records than that available under the discovery rules that an agency chooses to promulgate. See concurring opinion of MR. JUSTICE STEVENS, *ante,* p. 243. There is no persuasive evidence that Congress in 1974 intended to authorize federal agencies to withhold all FOIA-requested material in pending proceedings by invoking restrictive rules of discovery promulgated under their "housekeeping" rulemaking authority.[1]

## I

The starting point is the language of Exemption 7 (A). Congress provided for the nondisclosure of "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings . . . ." Establishing a presumption of disclosure, the Act "does not authorize withholding of information or limit the availability of records to the public,

---

[1] The FOIA was enacted in 1966 as a remedy for agency "housekeeping" rules that had restricted unduly public information about the operations of Government. See H. R. Rep. No. 1497, 89th Cong., 2d Sess., 3–6 (1966); S. Rep. No. 813, 89th Cong., 1st Sess., 3, 5 (1965). Congress intended to establish legislative standards for nondisclosure of official information and to empower the federal courts to review claims of agency noncompliance with those standards.

except as specifically stated in this section." 5 U. S. C. § 552 (c) (1976 ed.). Moreover, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." § 552 (b).

The language of Exemption 7 (A) simply cannot be squared with the Court's conclusion that "giving a party litigant earlier and greater access to the Board's case than he would otherwise have" under agency rules is "the kind of harm that Congress believed would constitute an 'interference' with NLRB enforcement proceedings . . . ." *Ante,* at 241. It is instructive to compare the 1974 amendment with the 1966 version of the "investigatory files" exemption. Exemption 7 as originally enacted permitted nondisclosure of "investigatory files compiled for law enforcement purposes except to the extent available by law to a private party." 80 Stat. 251.[2] Congress in 1974 abandoned the language that keyed the standard of disclosure to that available generally to private litigants.[3] In its place, Congress prescribed that the withholding of investigatory records be based upon one or more of six specified types of harm. That change in language suggests that Congress may have intended a more focused inquiry into the likelihood of harm resulting from disclosure of investigatory records than was possible under a standard defining the scope of disclosure in terms of an agency's rules of discovery.[4]

---

[2] The exception clause first appeared in a post-passage amendment on the floor of the Senate to accommodate Senator Humphrey's desire that the investigatory files exemption shield from disclosure prehearing statements of NLRB witnesses. 110 Cong. Rec. 17666–17668 (1964), reprinted in Subcommittee on Administrative Practice and Procedure, Senate Judiciary Committee, Freedom of Information Act Source Book, S. Doc. No. 93–82, pp. 109, 111 (1974).

[3] Congress did not disturb similar language contained in Exemption 5, 5 U. S. C. § 552 (b) (5) (1976 ed.). See *EPA* v. *Mink,* 410 U. S. 73, 85–86 (1973).

[4] Although the Committee Reports and the debates appear to be silent on

The Court of Appeals in this case observed that "[i]f the mere fact that one could not have obtained the document in private discovery were enough, the Board would have made naught of the requirement that nondisclosure be permitted 'only to the extent that . . . production . . . would . . . interfere' in some way" with the proceeding. 563 F. 2d 724, 730 (CA5 1977). There also is force to the Court of Appeals' view that such a standard is unworkable because the courts have not accorded uniform recognition to the Board's authority to deny rights of discovery to litigants in proceedings before it. Moreover, that court noted that a discovery standard may require an assessment of the particular needs of the FOIA plaintiff when the Act mandates release of information "to any person," 5 U. S. C. § 552 (a)(3) (1976 ed.), incorporating the principle that "anyone's case is as strong (or as weak) as

the point, the deletion of the exception clause has been viewed as evidence of an intent to broaden the scope of disclosure under Exemption 7. See Fuselier & Moeller, NLRB Investigatory Records: Disclosure Under the Freedom of Information Act, 10 U. Rich. L. Rev. 541, 546 (1976). Others have attached little significance to this change in language. See Attorney General's Memorandum on the 1974 Amendments to the Freedom of Information Act 5 n. 3 (1975), reprinted in House Committee on Government Operations and Senate Committee on the Judiciary, Freedom of Information Act and Amendments of 1974 (Pub. L. 93–502) Source Book, 94th Cong., 1st Sess., 515 (Joint Comm. Print 1975) (hereinafter cited as 1975 Source Book); Ellsworth, Amended Exemption 7 of the Freedom of Information Act, 25 Am. U. L. Rev. 37, 45–46, n. 39 (1975). In an early decision, the clause had been construed "to limit persons charged with violations of federal regulatory statutes to the discovery available to persons charged with violations of federal criminal law." *Bristol-Myers Co.* v. *FTC*, 138 U. S. App. D. C. 22, 26, 424 F. 2d 935, 939, cert. denied, 400 U. S. 824 (1970). See Note, The Freedom of Information Act: A Seven-Year Assessment, 74 Colum. L. Rev. 895, 948, and n. 291 (1974). The proviso later was relied on by the same court to deny disclosure to an FOIA litigant who would not have been a "party" engaged in litigation with an agency. See *Weisberg* v. *United States Dept. of Justice*, 160 U. S. App. D. C. 71, 79 n. 15, 489 F. 2d 1195, 1203 n. 15 (1973) (en banc), cert. denied, 416 U. S. 993 (1974).

anyone else's." 563 F. 2d, at 730; see *NLRB* v. *Sears, Roebuck & Co.*, 421 U. S. 132, 143 n. 10 (1975).

Nor does the legislative history provide more than ambiguous support for the Court's reading. There are statements by Senator Hart, the principal sponsor of the Exemption 7 amendment, that appear favorable. But these statements, made on the floor of the Senate, are not very clear on the point in dispute. Thus while Senator Hart noted that the original intent of the 1966 provision was to deny "an opposing litigant earlier or greater access to investigative files than he would otherwise have," 120 Cong. Rec. 17033 (1974), reprinted in 1975 Source Book 332, he also said that Exemption 7 (A) "would apply whenever the Government's case in court—a concrete prospective enforcement proceeding—would be harmed by the premature release of evidence or information not in the possession of known or potential defendants." *Id.,* at 333. If Exemption 7 (A) were intended to authorize nondisclosure in *every* pending proceeding, it is doubtful that Senator Hart would have spoken in terms of *"whenever* the Government's case in court . . . *would be harmed* by the premature release . . . ." I find equally unilluminating statements to the effect that the 1974 amendment was not intended to work "a radical departure from existing case law under the Freedom of Information Act." *Id.,* at 334 (remarks of Sen. Hart).

The one point that emerges with clarity is that Congress intended that "the courts look . . . to the reasons for the seventh exemption before allowing the withholding of documents." *Ibid.* But it is difficult to reconcile that principle with the underlying rationale of the Court's opinion that "the release of information in investigatory files prior to the completion of an actual, contemplated enforcement proceeding was precisely the kind of interference that Congress continued to want to protect against." *Ante,* at 232. Congress had before it several proposals that would have drawn the line between

files in "pending or contemplated" proceedings and files in "closed" cases. These were not adopted.[5] One must assume that a deliberate policy decision informed Congress' rejection of these alternatives in favor of the language presently contained in Exemption 7 (A). Moreover, as the Court notes, *ante,* at 229 n. 10, at least two of the decisions of the Court of Appeals for the District of Columbia Circuit that Congress intended to overrule "involved files in still-pending investigations." See *Ditlow* v. *Brinegar,* 161 U. S. App. D. C. 154, 494 F. 2d 1073, cert. denied, 419 U. S. 974 (1974); *Center for National Policy Review* v. *Weinberger,* 163 U. S. App. D. C. 368, 502 F. 2d 370 (1974).[6] Senator Hart stated that these cases, among others, were wrongly decided because the courts failed to approach the disclosure issue "on a balancing basis, which is exactly what this amendment seeks to do." 1975 Source Book 349.

The Court's approach in this case also is in tension with Congress' most recent amendment to the Act. Congress in 1976 overturned our decision in *FAA Administrator* v. *Robertson,* 422 U. S. 255 (1975), which held that Exemption 3, 5 U. S. C. § 552 (b)(3), should not be interpreted to disturb a broad delegation of authority to an agency to withhold information from the public. Pub. L. No. 94–409, § 5 (b)(3), 90 Stat. 1247. Congress tightened the standard for Exemp-

---

[5] See 2 Hearings on S. 1142 et al. before the Subcommittees on Administrative Practice and Procedure and Separation of Powers of the Senate Judiciary Committee and the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 93d Cong., 1st Sess., 2 (1973) (Sen. Kennedy); *id.,* at 227 (Dept. of Justice), discussed in 1975 Source Book 339; *id.,* at 338 (Committee on Federal Legislation of the Assn. of Bar of City of New York).

[6] In *Center for National Policy Review,* for example, the court held that Exemption 7 permitted the Secretary of Health, Education, and Welfare to resist disclosure of the material of 22 "open and active" files involving agency review of public school discrimination practices in northern localities.

tion 3 "to exempt only material required to be withheld from the public by any statute establishing particular criteria or referring to particular types of information," and rejected *Robertson*, which was viewed as "afford[ing] the FAA Administrator cart[e] blanche to withhold any information he pleases . . . ." H. R. Rep. No. 94–880, pt. 1, p. 23 (1976). The Court's ruling today appears to afford an agency similar *carte blanche* authority to withhold witness statements in investigatory files, at least during the pendency of an enforcement proceeding.

The Court appropriately recognizes the danger that FOIA claims are "likely to cause substantial delays in the adjudication of unfair labor practice charges." *Ante,* at 237–238. But Congress had a right to insist, as I believe it did in the 1974 legislation, that nondisclosure of investigatory records be grounded in one of the six specific categories of harm set out in Exemption 7, even though litigation may ensue over disputed claims of exemption.

## II

As the Court demonstrates, the congressional requirement of a specific showing of harm does not prevent determinations of likely harm with respect to prehearing release of particular categories of documents. The statements of the Act's sponsors in urging an override of President Ford's veto of the 1974 amendments shed light on this point. The President's message to Congress explained that "confidentiality would not be maintained if many millions of pages of FBI and other investigatory law enforcement files would be subject to compulsory disclosure at the behest of any person unless the Government could prove to a court—separately for each paragraph of each document—that disclosure 'would' cause a type of harm specified in the amendment." 1975 Source Book 484. The bill's proponents discounted the President's concern. See *id.,* at 405–406 (remarks of Rep. Moorhead); *id.,* at 451–452

(remarks of Sen. Hart). As then Attorney General Levi observed: "This legislative history suggests that denial can be based upon a reasonable possibility, in view of the circumstances, that one of the six enumerated consequences would result from disclosure." Attorney General's Memorandum on the 1974 Amendments to the Freedom of Information Act 13 (1975), reprinted in 1975 Source Book 523.

## A

In my view, the Board has demonstrated a "reasonable possibility" that harm will result from prehearing disclosure of statements by current employees that are damaging to their employer's case in an unfair labor practice proceeding. The Courts of Appeals have recognized with virtual unanimity that due to the "peculiar character of labor litigation[,] the witnesses are especially likely to be inhibited by fear of the employer's or—in some cases—the union's capacity for reprisal and harassment." *Roger J. Au & Son, Inc.* v. *NLRB,* 538 F. 2d 80, 83 (CA3 1976).[7] The "delicate" relationship between employer and employee—or between union and employee-member—suggests that "[t]he labor case is peculiarly susceptible to employer [or union] retaliation, coercion, or influence to the point that it can be concluded that there is no need for an express showing of interference in each case to justify giving effect to the exemption contained in Section 7 (A) in

---

[7] The Court of Appeals in this case also recognized that "there may be some risk of interference with Board proceedings in the form of witness intimidation from harassment of an employee-witness during the five days prior to the hearing, done in an effort to silence him or dilute the nature of his testimony." 563 F. 2d 724, 732 (CA5 1977). It determined, however, that the Board had failed to introduce any evidence tending to show that such intimidation was likely, and declined to accept the Board's assertion that "in every case the potential for intimidation is so great as to require nondisclosure of *all* statements and affidavits." *Id.,* at 732–733 (emphasis supplied).

Labor Board proceedings." *Climax Molybdenum Co.* v. *NLRB,* 539 F. 2d 63, 65 (CA10 1976).

The Board knows from experience that an employer or a union charged with an unfair labor practice often can exercise special influence—either through threats or promises of benefit—over employees or members whose welfare and opportunity for advancement depend on remaining in the good graces of the charged party. Accordingly, the Court has construed § 8 (a)(4) of the National Labor Relations Act, as amended, 61 Stat. 140, 29 U. S. C. § 158 (a)(4), to protect employees who give written sworn statements to a Board field examiner even when they do not file a charge or testify at a formal hearing on the charge. *NLRB* v. *Scrivener,* 405 U. S. 117 (1972).[8]

Although the Board may be able to impose *post hoc* sanctions for interference with its witnesses, see 29 U. S. C. §§ 158 (a)(4) and 162; 18 U. S. C. § 1505 (1976 ed.), these remedies cannot safeguard fully the integrity of ongoing unfair labor practice proceedings. Intimidation or promise of benefit may be subtle and not susceptible of proof. As the Board cannot proceed without a charge filed by knowledgeable individuals, see *Nash* v. *Florida Industrial Comm'n,* 389 U. S. 235, 238 (1967), many instances of interference could go undetected. Even if interference is detected and a complaint is filed, appropriate sanctions often cannot be imposed until after the initial unfair labor practice proceeding has terminated. Moreover, as the Court notes, many employees, mindful of the

---

[8] The Court's substantive labor law rulings have "take[n] into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *NLRB* v. *Gissel Packing Co.,* 395 U. S. 575, 617 (1969); see *Textile Workers* v. *Darlington Co.,* 380 U. S. 263 (1965); *NLRB* v. *Exchange Parts Co.,* 375 U. S. 405 (1964). Similar considerations apply to statements made or inducements offered by labor unions. See, *e. g., NLRB* v. *Savair Mfg. Co.,* 414 U. S. 270 (1973).

Board's prehearing settlement practice, may be willing to cooperate with the Board because they know that their identity will not be revealed and they will not be called to give public testimony adverse to their employer's interest unless such a course is absolutely necessary.

Until the Board's view here is proved unfounded, as an empirical matter, I agree that the danger of altered testimony—through intimidation or promise of benefit—provides sufficient justification for the judgment that disclosure of unfavorable statements by current employees prior to the time when they are called to give testimony before an administrative law judge, "would interfere with enforcement proceedings . . . ." [9]

## B

But the Court holds that *all* "witness statements in pending unfair labor practice proceedings are exempt from FOIA disclosure at least until completion of the Board's hearing. . . ." *Ante,* at 236. I find no warrant for that sweeping conclusion in the expressed intention of the 93d Congress. Exemption 7 (A) requires that the Board demonstrate a reasonable possibility that disclosure would "interfere with enforcement proceedings . . . ." In my view, absent a particularized showing of likely interference, statements of all witnesses—other than current employees in proceedings against employers (or union members in proceedings against unions)—are subject to the statutory presumption in favor of disclosure. In contrast to the situation of current employees or union members, there simply is no basis for presuming a particular likelihood of employer interference with union representatives or others not employed by the charged party, or, in a proceeding against a union, of union interference with employer representatives and other nonmembers of the union or the bargaining unit. Simi-

---

[9] Similarly, the Board may protect against prehearing disclosure statements by union members and employees unfavorable to the union's cause in an unfair labor practice proceeding.

larly, I am unwilling to presume interference with respect to disclosure of favorable statements by current employees, and would require the Board to show a reasonable possibility of employer reprisal. See *Temple-Eastex, Inc.* v. *NLRB*, 410 F. Supp. 183, 186 (ED Tex. 1976).

I do not read the Act to authorize agencies to adopt or adhere to nonstatutory rules [10] barring all prehearing disclosure of investigatory records. The Court reasons, *ante*, at 241, that such disclosure—which is deemed "premature" only because it is in advance of the time of release set by the agency—will enable "suspected violators . . . to learn the Board's case in advance and frustrate the proceedings or construct defenses which would permit violations to go unremedied . . . ." *Title Guarantee Co.* v. *NLRB*, 534 F. 2d 484, 491 (CA2), cert. denied, 429 U. S. 834 (1976). This assumption is not only inconsistent with the congressional judgment expressed in the Federal Rules of Civil Procedure that "trial by ambush," *New England Medical Center Hosp.* v. *NLRB*, 548 F. 2d 377, 387 (CA1 1976); *Capital Cities Communications, Inc.* v. *NLRB*, 409 F. Supp. 971, 977 (ND Cal. 1976), well may disserve the cause of truth, but it also threatens to undermine the Act's overall presumption of disclosure, at least during the pendency of enforcement proceedings. [11]

---

[10] It may be that criminal law enforcement agencies will be able to resist pretrial disclosure of witness statements on the theory that the Jencks Act, 18 U. S. C. § 3500 (a) (1976 ed.), falls within the terms of Exemption 3 of the Act; see *supra*, at 248–249.

[11] I do not construe the Court's ruling today to authorize agencies to withhold disclosure of materials generated in closed or otherwise inactive proceedings, absent a particularized showing of harm, even though the Board itself would like this authority. Brief for Petitioner 33 n. 17. The Board has advanced this view in the Courts of Appeals with some success. Compare *New England Medical Center Hosp.* v. *NLRB*, 548 F. 2d, at 385–386 (records generated in a related, inactive investigation held protected against disclosure), with *Poss* v. *NLRB*, 565 F. 2d 654, 657 (CA10 1977) (statements taken in an investigation that ended in a decision not to issue a complaint held not protected).

There may be exceptional cases that would permit the Board to withhold all witness statements for the duration of an unfair labor practice proceeding. Such a situation could arise where prehearing revelation would divulge incompletely developed information which, if prematurely disclosed, may interfere with the proceedings before the Board, or where the facts of a case suggest a strong likelihood that the charged party will attempt to interfere with any and all of the Board's witnesses. The Act requires, however, that the Board convince a federal court that there is a reasonable possibility of this kind of interference.[12]

I would reverse the judgment of the Court of Appeals to the extent that it requires prehearing disclosure of unfavorable statements by respondent's current employees, but affirm as to any remaining statements in dispute.[13]

---

[12] In light of my view of the limits of Exemption 7 (A), I reach the Board's alternative argument that the witness affidavits in dispute are protected against disclosure by Exemption 5, 5 U. S. C. § 552 (b)(5) (1976 ed.). That section provides that the Act does not apply to "interagency or intra-agency memorandums or letters which would not be available by law to a party other than any agency in litigation with the agency. . . ." I agree generally with the analysis of the Court of Appeals that the purpose of this Exemption is to protect agency litigation strategy and decisionmaking processes, and not to incorporate fully the "work product" privilege recognized in *Hickman* v. *Taylor,* 329 U. S. 495 (1947), and Fed. Rule Civ. Proc. 26 (b)(3). Our decision in *NLRB* v. *Sears, Roebuck & Co.,* 421 U. S. 132, 154–155, 159–160 (1975), provides support for this view. In this case, by contrast, the Board does not suggest that the witness affidavits in question are anything other than verbatim transcripts of statements made by witnesses to Board personnel.

[13] There is no need for a remand in this case, cf. *Harvey's Wagon Wheel, Inc.* v. *NLRB,* 550 F. 2d 1139, 1143 (CA9 1976), for the Board conceded in the District Court that "[t]here's nothing unique in Board proceedings in these statements . . . ." App. 91.