ASSOCIATED DRY GOODS
CORPORATION, Plaintiff,

v.

NATIONAL LABOR RELATIONS
BOARD, Defendant.

No. 76 Civ. 4051 (CHT).

United States District Court,
S. D. New York.

July 13, 1978.

Jackson, Lewis, Schnitzler & Krupman by Roger S. Kaplan, Robert Lewis, New York City, for plaintiff.

John S. Irving, Gen. Counsel; John E. Higgins, Jr., Deputy Gen. Counsel; Carl L. Taylor, Associate Gen. Counsel; Elliott Moore, Deputy Associate Gen. Counsel, by Janet C. McCaa, Deputy Asst. Gen. Counsel for Sp. Litigation, Andrew Tranovich, Atty., Washington, D. C., and Edwin H. Bennett, Regional Atty., Region 2, N.L. R.B., New York City, for defendant.

## OPINION

TENNEY, District Judge.

The plaintiff, Associated Dry Goods Corporation, brings this action under the Freedom of Information Act ("the FOIA"), 5 U.S.C. § 552, seeking to compel defendant National Labor Relations Board ("NLRB") to make available for copying virtually the entire contents of a certain closed unfair-labor-practice-case file. The NLRB had refused to honor a good portion of the plaintiff's direct request, contending that the portions of the file not produced were exempt from disclosure under various provisions of 5 U.S.C. § 552(b). There being no material facts in issue, both parties have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Court has reviewed the entire contents of the two folders which make up the case file. For the reasons stated below, the Court finds that certain portions of the file come within the FOIA's stated exemptions, while others do not so qualify and thus must be disclosed. Accordingly, both motions for summary judgment are granted in part and denied in part.

### The Faulk/Pemberton Unfair Labor Practice Case

On December 20, 1972, Reeda Faulk and Shirley Pemberton filed identical unfair labor practice charges with the 25th Regional Office of the NLRB, located in Indianapolis, Indiana. Faulk and Pemberton contended that their employer, Local Union # 135 of the International Brotherhood of Team-

sters, Chauffeurs, Warehousemen and Helpers of America ("the Union"), had terminated their employment on November 17, 1972, in violation of their rights as employees protected under Section 8(a) of the National Labor Relations Act, 29 U.S.C. § 158(a), including their right to engage in concerted activity. An NLRB Field Examiner was assigned to investigate these charges. On January 8, 1973, the charging parties designated an attorney to serve as their representative, and, on the same day, that attorney, at the Board's request, filed with the Board and served on the Union a list of witnesses who could substantiate the allegations made by Faulk and Pemberton. As the Board had also requested, that list of witnesses included "a summary of what you expect each [witness] will testify [to]."

In late January and early February 1973 the NLRB agent collected the affidavits and statements of nine employees of the Union, including seven of the nine included on the list prepared by the charging parties' attorney. He also received the statements of six individuals who could be described as the management of the Union. Finally, incorporated into the investigative file were numerous statements and affidavits of the two charging parties themselves and a great deal of documentary evidence concerning employees of the Union, their wages, benefits and work histories. At the end of February, the Field Examiner submitted a lengthy "Final Investigation Report" summarizing the case from his perspective, commenting on the evidence, and recommending a course of action to the Regional Director. On February 28, 1973, the Regional Director issued a complaint alleging that the Union had violated Sections 8(a)(1) and (3) of the NLRA, 29 U.S.C. §§ 158(a)(1), (3). The Union denied the allegations.

At this point the clarity of the narrative must fade somewhat, obscured by the intricacies of NLRB internal procedure, the inherent opacity of which is further dimmed in this case by the Board's apparent failure to follow its own internal rules. Nevertheless, the narrative is vital, for, as the Supreme Court has noted, "an understanding of the function of the [requested] documents in issue in the context of the administrative process which generated them" is "[c]rucial to the decision" of an FOIA case. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138, 95 S.Ct. 1504, 1510, 44 L.Ed.2d 29, 40 (1975).

At some point early in May 1973, an "informal settlement agreement" was worked out between at least some of the parties involved in the by-now-pending unfair labor practice case. That agreement was signed on May 15, 1973, by a representative of the Union and by charging party Pemberton. Charging party Faulk, however, did not sign, and on May 16, 1973, was sent a letter by the Regional Director informing her that "the *proposed* Settlement Agreement comprises substantially the same remedy as might be determined in the hearing" (*i. e.*, a hearing upon the complaint, which was still in force, not having been withdrawn) and stating that "it is proposed to approve [the Settlement Agreement] unless you give good reason to the contrary." Complaint, Exh. H–1 (emphasis added). Faulk was given five days in which to respond; hence, the type of letter sent is known as a "five-day letter." This procedure complied fully with Board procedure. Section 10152.1(a) of the *NLRB Casehandling Manual (Part One) Unfair Labor Practice Proceedings* (April 1975) ("*NLRB Manual*"), which governs the "Effectuation, Performance, and Closing of [a] 'Unilateral' Settlement Case," *i. e.*, the "settlement" of a case "without the participation of the charging party," *id.* § 10134.2(b), requires the Regional Director to send a "five-day letter" to the charging party. However, the Regional Director is without authority to *approve* a postcomplaint unilateral settlement agreement without clearance from "Washington" (*i. e.*, the General Counsel). *Id.* §§ 10124.4, 10148.1, 11751.-2(d). Thus, steps were taken within the NLRB structure to secure "Washington" approval. Faulk filed the requested letter stating her objections to the settlement agreement.

At the same time, however, another process began. On May 30, 1973, the Regional Director sent Faulk a letter stating that he was "refusing to issue complaint in this matter" and informing Faulk of her right to appeal this "action" to the General Counsel of the NLRB. Complaint Exh. I. This correspondence was in error. The complaint issued in February was still in effect in the case, no order withdrawing it having been entered. Thus, it was not possible for the Regional Director to "issue" or even to "reissue" a complaint. Furthermore, the withdrawal of the complaint would not be accomplished until the settlement agreement was approved, and that step could not be taken until the Regional Director had secured clearance from Washington. Simply stated, the Regional Director jumped the gun on the issuance of the "13-day letter" sent on May 30. It appears from the file, however, that this momentary lapse was overlooked in this case, and the two processes—approval of the *proposed* settlement agreement and appeal from the "approval" of that agreement—were amalgamated into a single review by the General Counsel of the settlement agreement and Faulk's objections to it.

That review resulted in a letter to Faulk from the General Counsel dated July 10, 1973, in which the "appeal" was denied. The two-page letter discussed Faulk's contentions in some detail and gave reasons why each of them would not suffice to upset the settlement agreement. Complaint Exh. L. It is apparent that the Regional Director took this "denial of the appeal" to also constitute clearance by "Washington" of the settlement agreement, for the Regional Director "approved" the agreement on July 13. On August 3, 1973, a letter was sent to all parties stating that the agreement had been approved. There follows in the file correspondence, mostly between the Union and the Board, concerning compliance with the settlement agreement, including the posting of notices and the payment of backpay. On March 13, 1974, the case was officially closed and the parties were so informed. Complaint Exh. M.

### The Associated Dry Goods FOIA Request

On July 27, 1976, almost two-and-a-half years after the closing of the case, attorneys representing the plaintiff wrote to the Regional Director requesting

the complete file in the closed case . . . including, but not limited to the following:

1. The charge as filed and any amendments thereto.

2. The Complaint as issued and any amendments thereto.

3. All statements taken by the Board from anyone having knowledge of the facts.

4. Copies of all documentary evidence other than statements obtained during the course of the Board's investigation.

5. The answer filed by the Respondent and any amendments filed thereto.

6. The field investigative report or reports made by the Board Agent charged with the responsibility for investigating this case.

7. All correspondence between the Region and the parties regarding this case.

8. The settlement agreement and notice, if any, signed by the parties.

9. All other documents in the file used by the Board in connection with the investigation and disposition of this matter.

Complaint Exh. N. The Assistant Regional Director wrote back on August 4, agreeing to furnish 22 separate documents from the file, but denying the request with respect to all other documents on the ground that they were "privileged from disclosure pursuant to Section 552(b)(5) and 552(b)(7)(A), (C), and (D) of the FOIA." Complaint Exh. O. The plaintiff obtained the documents to which it had been granted access and simultaneously filed an appeal from the denial of complete access. *Id.* Exhs. P–R. The appeal was denied by the Board's General Counsel by letter dated August 31, 1976, which relied on the confidentiality inherent in the Board's relationship to witnesses and on Exemption 5 with respect to internal memoranda of the Board. *Id.* Exh. S.

The instant action was filed in September. Both parties moved for summary judgment and argument was heard on January 20, 1977. Because it was apparent that applicability of the various exemptions claimed under the FOIA could be determined only after a careful examination of the documents in question, the Court directed the Board to produce the entire case file in camera. 5 U.S.C. § 552(a)(4)(B). Thereafter, the parties continued to provide the Court with recently decided cases and letters arguing therefrom, the latest and most important of which was the Supreme Court's decision in *NLRB v. Robbins Tire & Rubber Co.,* —— U.S. ——, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978).

### Documents in the Case File

The case file contains a great many documents. In some measure, the categorization of these documents will be helpful to a determination of the applicability of the various exemptions. To a certain degree, however, those determinations must be made with respect to various parts of individual documents, with redaction of the exempt portions of these documents following where necessary. Since the documents are not given any logical sequence in the file, either chronological or categorical, the Court's summary of the contents, based on the Court's own examination of the file, may not be absolutely correct in every particular. This examination reveals the following categories, with a brief description of the contents of each:

1. Documents prepared by Board staff. This category may be broken down further:

 a. Formal and routine communications to the parties. This category includes documents such as "Orders Rescheduling Hearing."

 b. Handwritten notes. Two sets of such notes appear to be present; it also appears that they were the work of an attorney in the Regional Office.

 c. Notes on the activity of an NLRB employee. These notes appear to be taken from a log summarizing, *inter alia,* the telephone calls received by an NLRB employee who is identified only by his initials. The pages in the file appear to have been chosen because they contain notations of calls from one of the charging parties.

 d. Internal memoranda. Approximately eight such memos are in the file, all short. They are communications between the Regional Director and his staff or between the staff of the Regional Office and the General Counsel's office. These documents either discuss procedure or present a staff member's recommendation on action to be taken by the official authorized to take that action.

 e. Final Investigation Report. While this report should be technically classified with the internal memoranda just discussed, its greater length and complexity make it somewhat different from the much briefer memoranda discussed in paragraph d.

 f. Letters to the parties disclosing Board action. These letters were discussed in the narrative above. All such letters were made available to the plaintiff.

 g. The complaint issued in the case.

2. Statements/affidavits taken during the course of the Board's investigation. This category may be further divided:

 a. Statements/affidavits of the charging parties. Each of the charging parties submitted a number of statements to the Board.

 b. Statements/affidavits of employees. Nine of the co-workers of the charging parties made statements.

 c. Statements/affidavits of Union officials. Six such individuals made statements. This category includes the person who directly supervised the work of the charging parties.

3. Documentary evidence collected by the Board. Most of this material would be most appropriately described as "personnel material." It includes unemployment insurance claims, letters of reprimand, lists of employees and their wage rates, medical insurance records, minutes of a Teamsters meeting, etc. Some of these documents

concern the employment history of the charging parties, some relate to other employees and some are general statements of Union policy.

4. Correspondence between the Union and the charging parties. Included in this category are the various letters of dismissal and follow-up correspondence and letters discussing the working-out of the settlement agreement.

5. Correspondence between the Union and the NLRB. Most of the material discusses compliance with the settlement agreement. Also included are letters from Union headquarters to other locations directing posting of the mandated notice and letters concerning the transmittal of documents.

6. Correspondence between the NLRB and the charging parties concerning fulfillment of the settlement agreement.

7. Documents submitted to the Board by the charging parties. In this category are formal documents, such as notices of appearance and a document entitled "Information to Substantiate Claim," filed by the charging parties' legal counsel, and letters from Faulk arguing against the settlement agreement or suggesting an alternative settlement.

8. The Settlement Agreement and the notice specified therein.

9. Documents concerning activities within the Union but seemingly unrelated to this unfair labor practice case. The Court notes that such documents are found at the end of the material contained in the larger of the two file folders submitted to the Court. Inasmuch as they do not concern this case, the Court will discuss them no further and will not direct their disclosure since they are not within the scope of the plaintiff's FOIA request.

### Disclosure Under the FOIA

Congress, in passing the FOIA, declared that the Act was intended "to establish a general philosophy of full agency disclosure unless information is exempted under clearly delineated language." S.Rep.No.813, 89th Cong., 1st Sess. 3 (1965), *quoted in EPA v. Mink,* 410 U.S. 73, 80 n.6, 93 S.Ct. 827, 832 n. 6, 35 L.Ed.2d 119, 128 n. 6 (1973). Thus, in

5 U.S.C. § 552(b), Congress carefully structured nine exemptions from the otherwise mandatory disclosure requirements in order to protect specified confidentiality and privacy interests. But unless the requested material falls within one of these nine statutory exemptions, FOIA requires that records and material in the possession of federal agencies be made available on demand to any member of the general public.

*NLRB v. Robbins Tire & Rubber Co., supra,* —— U.S. at ——, 98 S.Ct. at 2316. In the instant case, the NLRB contends that all documents not disclosed come within one or more of four specific exemptions, *i. e.,* Exemptions 5, 7(A), 7(C) and 7(D), 5 U.S.C. §§ 552(b)(5), 7(A), (C), (D). Each exemption will be discussed separately.

*Exemption 5*

 Exemption 5 states that an agency need not disclose "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." *Id.* § 552(b)(5). The Board argues that "*[a]ll* of the documents requested by Associated in this case fall within the work product privilege aspect of the exemption." Defendant's Memorandum 42. In support of this bold assertion they cite the Supreme Court's statement in *NLRB v. Sears, Roebuck & Co., supra,* that "Congress had the attorney's work-product privilege specifically in mind when it adopted Exemption 5" and that "the case law clearly makes the attorney's work-product rule of *Hickman v. Taylor,* 329 U.S. 495 [, 67 S.Ct. 385, 91 L.Ed. 451] (1947), applicable to Government attorneys in litigation." 421 U.S. at 154, 95 S.Ct. at 1518. Thus, the Board argues, the fullest scope of the rule of *Hickman v. Taylor* should be read into Exemption 5, which would bring all "interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and

intangible" types of material, found by the *Hickman* Court to be included within the concept of the "work product of the lawyer," 329 U.S. at 511, 67 S.Ct. at 393, within the protection of the exemption.

The Court cannot agree that Exemption 5 should be given so broad a sweep. Certainly, the Supreme Court did not make such a ruling in *NLRB v. Sears, Roebuck & Co., supra,* in which the Court held only that the work-product branch of Exemption 5 "clearly applies to memoranda prepared by an attorney in contemplation of litigation which set forth the attorney's theory of the case and his litigation strategy." 421 U.S. at 154, 95 S.Ct. at 1518. This holding was prefaced by the qualifying phrase, "[w]hatever the outer boundaries of the attorney's work-product rule are . . . ." *Id.* It would seem, however, that the language of Exemption 5 itself limits the scope of the FOIA work-product exemption to the type of material considered by the *Sears* Court, specifically including only "memorandums and letters" as within the scope of the exemption and eschewing any mention of the immense variety of other documents which might pass through an attorney's hands or eventually come to reside in an attorney's files. Moreover, the Senate Report, to which the *Sears* Court looked to discern the congressional intent in establishing Exemption 5, stated that documents within the exemption "would include the *working papers* of the agency attorney and *documents which would come within the attorney-client privilege* if applied to private parties." S.Rep.No.813, *supra* at 2, *quoted in NLRB v. Sears, Roebuck & Co., supra,* 421 U.S. at 154, 95 S.Ct. 1504, 1518 (emphasis added). With respect to the second of these two categories, the *Hickman* Court specifically held that the type of papers found in *Hickman* to be protected by the attorney work-product doctrine were *not* within the scope of the attorney-client privilege. *Hickman v. Taylor, supra,* 329 U.S. at 508, 67 S.Ct. 385. With respect to those documents identified by the ambiguous phrase "working papers of the agency attorney," this Court reads that phrase to signify papers actually "prepared by an attorney in contemplation of litigation which set forth the attorney's theory of the case and his litigation strategy," *NLRB v. Sears, Roebuck & Co., supra,* 421 U.S. at 154, 95 S.Ct. at 1518, or in any other way reflect the "full and frank exchange of *opinions*" which characterize the "internal communications" of government agencies. H.Rep. No.1497, 89th Cong., 2d Sess., *reprinted in* [1966] U.S.Code Cong. & Admin.News, pp. 2418, 2427.

This conclusion is supported by the Supreme Court's earlier decision in *EPA v. Mink, supra.* There, the Court noted that

> [v]irtually all of the courts that have thus far applied Exemption 5 have recognized that it requires different treatment for materials reflecting deliberative or policy-making processes on the one hand, and purely factual, investigative matters on the other.

410 U.S. at 89, 93 S.Ct. at 837. Thus, the *Mink* Court concluded that Exemption 5 did not protect from disclosure "purely factual material appearing in [Government] documents" when that material "is severable without compromising the private remainder of those documents." *Id.* at 91, 93 S.Ct. at 838. A number of courts have applied this reasoning in holding that Exemption 5 did not protect factual material—such as statements taken from witnesses interviewed by NLRB field examiners—from disclosure. *Poss v. NLRB,* 565 F.2d 655 (10th Cir. 1977); *Amerace Corp. v. NLRB,* 431 F.Supp. 453, 455 (W.D.Tenn.1976); *Marathon LeTourneau Co. v. NLRB,* 414 F.Supp. 1074, 1080 (S.D.Miss.1976); *cf. Title Guarantee Co. v. NLRB,* 534 F.2d 484, 492 n.15 (2d Cir.), *cert. denied,* 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976) (discussing, without passing judgment upon, district court's holding that "while Exemption 5 doubtless covers internal communications consisting of advice, recommendations and opinions, as well as other materials incorporating deliberative or policymaking processes, it does not cover purely factual or investigatory reports unless those reports are 'inextricably intertwined' with the deliberative or policymaking functions of the agency").

Even though the protection of Exemption 5 does not extend to the entirety of the case file in question, it may be properly used to shield from public scrutiny a more limited set of documents—those which " 'reflect the agency's group thinking in the process of working out its policy and determining what its law should be,' " (executive privilege) or were "prepared . . . in contemplation of litigation" (work-product privilege). *NLRB v. Sears, Roebuck & Co., supra,* 421 U.S. at 153–54, 95 S.Ct. at 1517–1518. Documents which might meet these requirements are found within Category 1 described above. Of these, Categories 1(a) and (f) have already been disclosed to the plaintiff. The remaining four categories will be dealt with separately.

■ *Category 1(d), Internal memoranda.* The documents in this category are all short memoranda, not more than one page in length, drafted by the Regional Director, a staff attorney in his office, or an Assistant General Counsel. They contain very little factual information and in the main consist of recommendations or opinions communicated to other officials charged with making decisions. In no respect do they represent "explanation[s] . . . of a legal or policy decision already adopted," *NLRB v. Sears, Roebuck & Co., supra,* 421 U.S. at 155, 95 S.Ct. at 1519, and thus may not be characterized as final opinions subject to obligatory disclosure.

The predecisional nature of these memoranda is due in part to the anomalous procedure followed in this case. As explained in greater detail above, the Regional Director simultaneously requested clearance from the General Counsel's office for his approval of the proposed settlement agreement and set in motion the "appeal" from his "action" declining to reissue a complaint in the case. In fact, however, the Regional Director had taken no action because he was without authority to do so. The only final decision made in this case was that of the General Counsel in approving the settlement/denying the appeal. The only document in the file which communicates that decision and the grounds therefor is the General Counsel's letter of July 10, 1973. Thus, the Court concludes that these memoranda are within the coverage of Exemption 5 since each is protected either by the executive privilege branch of the exemption, by the work-product branch, or by both. *See NLRB v. Sears, Roebuck & Co., supra,* 421 U.S. at 148–55, 95 S.Ct. 1504; *Marathon LeTourneau Co. v. NLRB, supra,* 414 F.Supp. at 1080.

■ The plaintiff argues that the "transmittal memorandum" by which the Regional Director informed the General Counsel of the issuance of a complaint is a "final opinion" because the Board never adjudicated the charges. The argument is meritless. The memorandum was clearly written in contemplation of litigation, the first step in which was the issuance of the complaint. The transmittal memorandum is fully analogous to the "Advice Memoranda" directing the issuance of complaints found to be protected by Exemption 5 in *NLRB v. Sears, Roebuck & Co., supra,* 421 U.S. at 159, 95 S.Ct. 1504.

■ *Category 1(e), Final Investigation Report.* As was explained above, this document is considerably more substantial than the other internal memoranda in the case file. Despite its recitation of much of the evidence gathered by the Field Examiner who prepared the Report, however, it is not a "purely factual" document; rather, the facts are combined with recommendations and evaluations and are thus "intertwined with policymaking processes," bringing the entire document within the scope of Exemption 5. *See EPA v. Mink, supra,* 410 U.S. at 91–92, 93 S.Ct. 827. As the court stated in discussing a similar report in *Kent Corp. v. NLRB,* 530 F.2d 612, 624 (5th Cir.), *cert. denied,* 429 U.S. 920, 97 S.Ct. 316, 50 L.Ed.2d 287 (1976),

[w]riting in contemplation of forthcoming unfair labor practice litigation, an attorney must be able not only to discuss doctrinal theories but also to "assemble information, [and] sift what he considers to be the relevant from the irrelevant facts" without feeling that he is working for his adversary at the same time. *Hickman v. Taylor* . . .

This case is a particularly strong one for recognizing the privilege. The contents of the reports are not primary information, such as verbatim witness testimony or objective data, but rather are reports on how the Birmingham attorneys appraised the evidence they found. Thus, the reports consist largely of "mental impressions, conclusions, opinions, [and] legal theories" within the meaning of the Federal Rule. . . .

The fact that the Field Examiner in this case may not have been an attorney does not make his report any less worthy of protection. *See* Fed.R.Civ.P. 26(b)(3). This report was clearly prepared as part of the Board's decisionmaking process, for the purpose of aiding the Regional Director in the making of his decision. The document announcing that decision—the complaint—was disclosed to the plaintiff. A predecisional communication leading to that decision is not disclosable. Moreover, the fact that the Regional Director decided to issue a complaint in this case brings the documents which contributed to that decision within the protection of the rule in *NLRB v. Sears, Roebuck & Co., supra.* In *Sears* the Court held that a memorandum of the General Counsel disclosing the decision to file a complaint came within Exemption 5 since it did not dispose of the General Counsel's responsibility with respect to the case. 421 U.S. at 159, 95 S.Ct. 1504. In this case, the Final Investigation Report was made to the Regional Director, who, while not directly responsible for the litigation of such cases, is active in attempts to settle them before the hearing, as the facts of this case demonstrate. Furthermore, the Report also becomes a part of the file transmitted to the General Counsel and is surely relied on heavily by the trial attorney in the litigation.

The protection of Exemption 5 has also been extended to final investigation reports by courts considering NLRB and similar administrative procedures. *Kent Corp. v. NLRB, supra; Howard Johnson Co. v. NLRB,* 444 F.Supp. 843, 844 (E.D.Mich. 1977); *American Federation of Government Employees v. Department of the Army,* 441 F.Supp. 1308, 1310–13 (D.D.C.1977); *Marathon LeTourneau Co. v. NLRB, supra,* 414 F.Supp. at 1080.

■ *Category 1(c), NLRB employee log.* Three pages from what appears to be a log summarizing the activities of an NLRB employee appear in the file. The lines discussing calls relevant to this case are purely factual and do not appear to come within any of the portions of Exemption 7 discussed more fully below. The remaining lines are not relevant to this case and may be private or confidential information. Accordingly, they may be redacted from the document before its disclosure.

■ *Category 1(b), handwritten notes.* The first of these notes is a one-page document dated "5/13" and addressed "To: file." It appears to be a predecisional memorandum properly within the scope of Exemption 5, as discussed above, and need not be disclosed. The remaining notes appear to be records of interviews of the charging parties and reflect only the answers of the charging parties. While these notes were written down only after having passed through the cognative faculties of an NLRB attorney, they cannot be said to reflect his thought processes, certainly not in the same way as the Final Investigation Report. Thus, they are the equivalent of the statements and affidavits submitted by the charging parties and will be subject to the same disclosure rulings.

*Exemption 7(A)*

■ Exemption 7(A) protects from disclosure "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would . . . interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). As with Exemption 5, the Board seeks to bring *all* materials requested within this single exemption by arguing that disclosure of statements and evidence taken during the investigation of this case "would interfere with future enforcement proceedings by deterring individuals with relevant information from cooperating in Board inves-

tigations." Defendant's Memorandum 13a. The Court concludes, however, that a careful reading of the legislative history and recent precedent demonstrates that Exemption 7(A) was not intended to provide blanket protection for the closed investigatory file at issue in this case.

Exemption 7(A) is the result of the 1974 Amendments to the FOIA. Congress, seeking to recapture the original intention of Exemption 7, made basic changes in the section, principally the specification of the six ways in which disclosure of investigatory records would be harmful to the functioning of government. In so doing, Congress specifically intended to overrule a series of cases which had established an automatic exemption for any portion of an investigatory file compiled for law enforcement purposes, regardless of the nature of the records in the file or the status of the investigation or proceeding in which they were gathered. *NLRB v. Robbins Tire & Rubber Co., supra,* —— U.S. at ——, 98 S.Ct. 2311.

As a result of the Supreme Court's decision in *Robbins Tire & Rubber,* it is now clear that Exemption 7(A) does afford blanket protection from disclosure to witness statements collected in an NLRB investigation "at least until completion of the Board's hearing." *Id.* at ——, 98 S.Ct. at 2324. It is not clear whether such protection continues after the termination of Board proceedings. This Court agrees with those courts that have found that it does not. *Poss v. NLRB, supra,* 565 F.2d at 657–58; *Gerico, Inc. v. NLRB,* 92 L.R.R.M. 2713, 2717 (D.Colo.1976); *Kaminer v. NLRB,* 78 Lab.Cas. ¶ 11,272, at 20,364 (S.D. Miss.1975).

The Board argues that this case is governed by the Second Circuit's decision in *Frankel v. SEC,* 460 F.2d 813 (2d Cir. 1972), wherein the court of appeals held that the contents of investigatory files were protected from disclosure "even after an investiga-

tion and an enforcement proceeding have been terminated." *Id.* at 817. The Court concludes that *Frankel* was in large measure overruled by the 1974 Amendments to the FOIA. First, although *Frankel* was not specifically mentioned by Senators Kennedy and Hart in their celebrated colloquy on the precedential targets of this legislative overruling, *see Source Book: Freedom of Information Act and Amendments of 1974,* at 349, Joint Comm. Print, 94th Cong., 1st Session (1975) ("*Source Book*"), *Frankel* was heavily relied on in the cases singled out by name by the Senators. *See, e. g., Aspin v. Department of Defense,* 160 U.S. App.D.C. 231, 236–237, 491 F.2d 24, 29–30 (1973); *Weisberg v. U. S. Dep't of Justice,* 160 U.S.App.D.C. 71, 74–75, 489 F.2d 1195, 1198–99 (1973) (en banc), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974). Furthermore, *Frankel* was specifically criticized in a report by the Association of the Bar of the City of New York which was printed in the record of the debate on the 1974 Amendments at the request of Senator Hart, the prime mover of the amendments. *Source Book* at 334.[1] Finally, the Supreme Court also appears to have concluded that *Frankel* either was or should have been within the sights of the Senators when they undertook to overrule overly broad judicial precedent. *See NLRB v. Robbins Tire & Rubber Co., supra,* —— at —— – —— n.14, 98 S.Ct. 2311.

■ In place of the automatic exemption for closed investigatory files, Congress instituted a series of specific categories within which files could be protected. Thus, Exemption 7(A) authorizes withholding when production would interfere with "enforcement proceedings." The Board argues that this term should be read to include future as well as pending proceedings since it is phrased in the plural and since Congress, in passing this subsection, specifically rejected a proposed version which would

---

1. Although *Frankel* may no longer exist as valid precedent, its holding was not totally disregarded by Congress, for the grounds on which it concluded that closed files should be protected—the possibility that an agency's investiga-

tory techniques might be exposed and the names of its informants revealed, 460 F.2d at 817—have been preserved in Exemptions 7(D) and 7(E). 5 U.S.C. §§ 552(b)(7)(D), (E).

have limited Exemption 7(A) to situations where disclosure "would interfere with pending or actually or reasonably contemplated enforcement proceedings." *Source Book* at 338. However, the use of the plural, "proceedings," does not lead to the conclusion that Congress intended that the term include *all* future proceedings. Congress could well have intended that the courts consider the impact of disclosure on specific, concrete proceedings other than the single proceeding in which the investigation was conducted if disclosure could have a serious effect on those corollary proceedings as well. *See, e. g., New England Medical Center Hospital v. NLRB*, 548 F.2d 377, 385–87 (1st Cir. 1976). Furthermore, the failure of Congress to use the specific language quoted above does not necessarily mean that it rejected such a meaning for the terms it did use. Indeed, Senator Hart explained his amendments to the Senate in terms almost identical to those "rejected":

> Let me clarify the instances in which nondisclosure would obtain: First, where the production of a record would interfere with enforcement procedures. This would apply whenever the Government's case in court—*a concrete prospective law enforcement proceeding*—would be harmed by premature release of evidence or information not in the possession of or known to potential defendants. . . .

*Source Book* at 333 (emphasis added)

The latter quotation reveals the primary purpose of Exemption 7(A): the prevention of harm to the Government's case in court. *Accord, NLRB v. Robbins Tire & Rubber Co., supra,* —— at —— – ——, 98 S.Ct. 2311. Accordingly, the FOIA's purposes are promoted "by deferring disclosure until after the Government has 'presented its case in court.'" *Id.* at ——, 98 S.Ct. at 2327. In reaching this conclusion, the Court found that disclosure of NLRB witness statements during the pendency of Board proceedings would harm the Government's case both by "giving a party litigant earlier and greater access to the Board's case than he would otherwise have," *id.,* and by making it possible for employers or unions to

"coerce or intimidate employees and others who have given statements, in an effort to make them change their testimony or not testify at all." *Id.* at ——, 98 S.Ct. at 2325.

The Board argues that the coercion or intimidation which employers can inflict on employees is not limited to the time during which the proceeding is pending and that the knowledge that statements may be disclosed after the conclusion of a proceeding will have a deterrent effect on the future willingness of employees to cooperate with the Board investigators. The Court concludes, however, that while this is a legitimate concern, it is more properly considered under the specific confidentiality rationale for nondisclosure established by Congress in Exemption 7(D). As the statements from *NLRB v. Robbins Tire & Rubber Co., supra,* demonstrate, the proper focus of Exemption 7(A) is on the effect of disclosure on specific, concrete proceedings. Since all proceedings connected with this unfair labor case ended some years ago, the Board cannot claim any protection for this file under Exemption 7(A).

*Exemption 7(D)*

Exemption 7(D) allows an agency to withhold records from an investigatory file where production would

> disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source.

5 U.S.C. § 552(b)(7)(D). The section sets up a two-tiered standard: in a civil investigatory file, such as that at issue in this case, only the *identity* of a "confidential source" is protected, while in a criminal context the information provided as well as the identity is within the exemption.

Although the term "confidential source" could be taken to indicate only a rather narrow range of Government "informers," the legislative history indicates

that the term is intended to include any person who provides "information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred." *Source Book* at 230. The Board argues that the employees and charging parties who gave statements during the Board's investigation did so under an assurance that their statements would remain confidential unless they were called to testify at a hearing. Defendant's Memorandum at 11–12. To release these statements, the Board contends, would undermine the Board's ability to conduct investigations since individuals would be reluctant to give statements if they knew that once the proceeding was over their employer could obtain those statements under the FOIA.

Although this argument may prevail in certain circumstances, the Court concludes that it does not support application of Exemption 7(D) in the instant case. First, the exemption exists only to protect the *identity* of confidential sources, not the information they provide. It cannot be seriously contended that the identity of those who gave statements to the Board in this case was ever a "confidential" matter. It appears from a document in the file that as of November 1, 1972, the time of the events in question in the investigation, there were only 21 employees in the Union's Indianapolis office. Of these, two were charging parties—whose identities were obviously known—and nine others gave statements to the Board. Moreover, in this case the identity and the substance of the testimony of seven of the nine was revealed to the employer by the attorney for the charging parties in his "Information to Substantiate Claim," a document which was served on the Union before the witnesses gave their statements.[2] Thus, the smallness of the labor force involved and the fact that virtually all of the names of the witnesses were revealed to the employer along with the substance of the witnesses' testimony negate any argument that the identity of the employee witnesses is "confidential" in this case.

*Exemption 7(C)*

The final exemption claimed by the Board is Exemption 7(C), which protects production of investigatory records "to the extent that the production of such records would . . . constitute an unwarranted invasion of personal privacy." In adding this language in the 1974 Amendments, Congress sought to "make clear that the protections in the sixth exemption for personal privacy also apply to disclosure under the seventh exemption." *Source Book* at 333. The Supreme Court has found that in establishing Exemption 6, "Congress sought to construct an exemption that would require a balancing of the individual's right of privacy against the preservation of the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.'" *Department of the Air Force v. Rose*, 425 U.S. 352, 372, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976). That same balancing of public interest and individual privacy must be carried out under Exemption 7(C).

Several courts have found that Exemption 7(C) does not protect the material normally found in an NLRB investigatory file. *E. g., Poss v. NLRB, supra,* 565 F.2d at 658; *Amerace Corp. v. NLRB, supra,* 431 F.Supp. at 456; *Hankamer Ready Mix Concrete Co. v. NLRB,* 92 L.R.R.M. 2720, 2724–25 (D.Kan.1976); *Kaminer v. NLRB, supra,* 78 Lab.Cas. at 20,364; *cf. Title Guarantee Co. v. NLRB, supra,* 534 F.2d at 489 n.10 (discussing district court finding that "material in question [contained] . . . 'no personal matters which should be protected under Exemption 7(C)'"). For the most

2. This document appears to have been prepared in response to the Regional Director's instructions to the charging parties that they provide the Board with "names, addresses and phone numbers of all witnesses to support the matters alleged in your charge, with a summary of what you expect each will testify [sic]." The letter requesting this information does not indicate that the response should also be served on the charged party, although the attorney representing the charging parties in this case did so.

part, however, these cases appear to have concerned files consisting almost entirely of witness statements about the events in question. This Court agrees that such material is not protected from disclosure; certainly in this instance the public right to know the support behind the allegations of an unfair labor practice outweigh any privacy considerations. The Court has examined the statements in this file and finds them virtually devoid of "vast amounts of personal data" or of information particularly sensitive or private. *See Department of the Air Force v. Rose, supra,* 425 U.S. at 377, 96 S.Ct. 1592.

 The case file at issue here contains much more material than mere statements of NLRB witnesses, however. As the Board points out in its memorandum, the investigation, because it involved the activities of the charging parties with respect to the health and welfare plan and also sought to discover whether the charging parties had been discriminated against,

> necessarily included a comparison of Faulk and Pemberton to the other office clericals employed by the Union, and required an evaluation by the Regional Director of such personal matters as their employment applications, educational attainments, disciplinary records, payroll records, work evaluations, application and entitlement for health and welfare benefits, absences and excuses for absences from work, and their requests for unemployment compensation and severance benefits.

Defendant's Memorandum at 35–36. Thus, there is within the file a great deal of material, particularly with respect to the charging parties, that can only be characterized as the essence of a "personnel file," the very type of file first mentioned in Exemption 6. Moreover, the information fits the Supreme Court's description of such a file almost perfectly: the file shows "where [the subject] was born, the names of his parents, where he has lived from time to time, his high school or other school records, results of examination, evaluations of his work performance." *Department of the*

*Air Force v. Rose, supra,* 425 U.S. at 377, 96 S.Ct. at 1606. As to other employees, the file contains data on health insurance, rates of pay, discharge, and time cards. Such information is quite personal and was placed in this file without the consent of the individuals whose private lives it reveals.

Against the truly personal nature of these personnel files, the plaintiff in this case can offer no countervailing public interest in disclosure. The case of Faulk and Pemberton was not remarkable or celebrated. It was settled short of adjudication. Associated Dry Goods Corporation has not offered a single reason why disclosure of these particular files is in the public interest.

Accordingly, the Court directs the Board to redact all documents or parts of documents concerning the participation of individuals in health and pension plans, rates of pay, reprimands for unsatisfactory performance, discharge, applications for employment, severance pay, union membership and similar items. The Court, having examined the statements and affidavits of employee witnesses in the file, concludes that no such matters are contained therein, save for paragraph 9 of the affidavit of Carrie Jeanette Smith, which may be redacted. It is evident that certain portions of the affidavits of the charging parties and of the Union officials will need to be redacted to comply with the Court's directive. After redaction, the Board will resubmit the file and redacted copies to the Court for in camera inspection.

In sum, the Court finds that internal memoranda of the Board which antedate the July 10, 1973 letter of the General Counsel denying Faulk's "appeal" are protected under Exemption 5 and that certain documents and portions of documents, as set forth immediately above, are protected under Exemption 7(C). All other exemptions are not applicable to this file, and all documents not within the two applicable exemptions must be disclosed. The Board is directed to reproduce the nonexempt portions of the file and make them available to

the Court in camera for inspection within 30 days of the entry of this Opinion, after which they shall be turned over to the plaintiff. The cross-motions for summary judgment are each granted in part and denied in part, and summary judgment is granted as to the entire complaint.

Settle judgment on notice.