**COMMUNITY LEGAL SERVICES, INC., Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVEL-OPMENT, Defendant.**

No. Civ.A. 04–CV–3474.

United States District Court, E.D. Pennsylvania.

Dec. 19, 2005.

Paul A. Brooks, Community Legal Services, Inc., Philadelphia, PA, for Plaintiff.

Gerald B. Sullivan, Assistant U.S. Attorney, Philadelphia, PA, for Defendant.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 et seq. (2005), the plaintiff Community Legal Services ("CLS") seeks an order directing the defendant, the United States Housing and Urban Development agency ("HUD"), to waive all fees for the production of its requested documents. Jurisdiction is proper under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331. Before me are the parties' Cross Motions for Summary Judgment. For the reasons that follow, I will grant the plaintiff's motion and deny the defendant's motion.

### I. Background

This action arises from HUD's refusal to grant CLS a fee waiver for CLS's FOIA request of July 23, 2004. CLS is a non-profit public interest organization providing free legal services to low- and moderate-income residents of Philadelphia. (CLS FOIA Req., Admin. R. at 1.) Its services include advising and representing clients in matters related to public and subsidized housing. (CLS Supp. Info., Admin. R. at 17.)

In 2002, PHA commenced the Moving to Work Demonstration Program ("MTW Program") pursuant to an agreement with HUD ("MTW Agreement"). (CLS Appeal, Admin. R. at 36.) "[I]n the name of moving tenants and Section 8 participants toward work, and improving efficiency,"

the MTW Agreement allows PHA to obtain waivers of regulations that would otherwise govern its public and subsidized housing programs. (Id. at 36–37.) Where HUD grants a waiver request, the MTW Agreement "provides for reports about, and monitoring of the consequences of the waiver."[1] (Id.)

Under the MTW Agreement, PHA may exercise "broad discretion to modify numerous requirements which previously governed its operations." (CLS FOIA Req., Admin. R. at 4.) Some of the changes that PHA has allegedly already made under the MTW Program include: modifying current rent calculation practices, e.g., no longer allowing child-care expenses to be deducted from gross income; proposing "major" changes to the Housing Choice Voucher Program, including setting a seven-year lifetime limit on most participants; "aggressive" demolition of PHA's public housing stock, with only partial replacement; and making available only 700 of the 2,800 housing subsidy vouchers for which it received funding in 2003. (Id. at 4–5; CLS Appeal, Admin. R. at 36.) CLS alleges that the PHA has failed to provide "detailed and timely information" to the public about these changes. (CLS FOIA Req., Admin. R. at 4–5.)

On July 23, 2004, CLS sent a FOIA request to HUD. (Id. at 1–6.) In its request, CLS requested twenty-four types of documents that HUD and PHA exchanged relating to the MTW Program, including correspondence, directives, notices, reports, inquiries, analyses, audits and other documents. (Id. at 1–3.) In addition, CLS asked HUD to waive all fees associat-

---

1. Although CLS's appeal letter stated that the MTW Agreement was enclosed, the copy of the Agreement was not provided in the administrative record. It is unclear whether CLS ultimately failed to enclose the agreement or whether HUD failed to include it in the administrative record.

ed with the production of these documents. (*Id.* at 4.)

On December 30, 2004, as per the parties' agreement, CLS submitted supplemental information relating to the fee waiver. (CLS Supp. Info., Admin. R. at 13, 16–29.) On January 13, 2005, HUD denied CLS's fee waiver request. (HUD Denial, Admin. R. at 30–34.) HUD classified CLS as an "Other requester" under 24 C.F.R. § 15.110(b)(5) and estimated its search and duplication costs at $1,418.10. (*Id.* at 32.)

On February 1, 2005, CLS administratively appealed HUD's decision. (CLS Appeal, Admin. R. at 35–47.) On March 7, 2005, HUD denied the appeal. (HUD Appeal Denial, Admin. R. at 48–49.)

On March 16, 2005, CLS filed an Amended Complaint in this civil action to challenge HUD's denial of its July 23, 2004 fee waiver request. On May 6, 2005, CLS and HUD filed Cross Motions for Summary Judgment.

## II.  Legal Standard

Under FOIA, a district court exercises *de novo* review of a federal agency's decision not to grant a fee waiver. 5 U.S.C. §§ 552(a)(4)(A)(vii). Judicial review is limited to the record before the agency. *Id.*

Summary judgment under Federal Rule of Civil Procedure 56(c) is proper if the pleadings, depositions and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III.  Discussion

The "basic purpose" of FOIA is to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *N.L.R.B. v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978). In most cases, FOIA allows agencies to charge fees for public access to government records and documents. *See* 5 U.S.C. § 552 *et seq.* FOIA's fee waiver provision, 5 U.S.C. § 552(a)(4)(A)(iii), directs agencies to furnish documents free of charge or at a reduced rate if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." HUD's implementing regulation, 24 C.F.R. § 15.110(h), reiterates the statutory provision.

■ Legislative history indicates that the fee waiver provision "is to be liberally construed in favor of waivers for noncommercial requesters." 132 Cong. Rec. S14,270–01 (daily ed. Sept. 30, 1986) (statement of Sen. Leahy). In 1974, Congress added the fee waiver provision in "an attempt to prevent government agencies from using high fees to discourage certain types of requesters and requests," particularly journalists, scholars, and non-profit public interest groups. *See Ettlinger v. Fed. Bureau of Investigation,* 596 F.Supp. 867, 872 (D.Mass.1984) (citing Senate Comm. on the Judiciary, Amending the Freedom of Information Act, S.Rep. No. 93–854, at 10–19 (1974)). The fee waiver provision was amended in 1986 in order "to remove the roadblocks and technicalities" that continued to stand in the way of obtaining a fee waiver. 132 Cong. Rec. S16,489–01 (daily ed. Oct. 15, 1986) (statement of Sen. Leahy). For further agreement on a generous construction of the fee waiver, *see also Judicial Watch, Inc. v. Rossotti,* 326 F.3d 1309, 1312 (D.C.Cir.2003) (hereinafter *"Judicial Watch 2003"*); *Forest Guardians v. U.S. Dep't of the Interior,* 416 F.3d 1173, 1178 (10th Cir.2005).

■ Although the fee waiver provision does not provide a legal test to use, courts consider the elements contained within the statutory language. In *Forest Guardians*, the Tenth Circuit broke down the statutory language into three elements:[2] 1) whether the subject matter of the request concerns "operations or activities" of the government; 2) whether the requested information is likely to contribute to "public understanding" of those operations or activities; and 3) whether the information is likely to contribute "significantly" to public understanding. Here, because the parties do not dispute that CLS's request concerns operations or activities of the government, thus satisfying the first factor, I will proceed to consider the other two factors.

### 1. Contribution to "public understanding" of government operations and activities

HUD contends that CLS fails to satisfy the second element, contribution to public understanding, for two reasons. First, CLS's target audience is too small. (Def's Mot. for Summ. J. at 12.) Secondly, CLS failed to describe "concrete measures" for disseminating the information. (*Id.* at 13.)

### A. Breadth and size of the interested public

Senator Leahy has clarified that "[a] request can qualify for a fee waiver even if the issue is not of interest to the public-at-large. Public understanding is enhanced when information is disclosed to the subset of the public most interested, concerned, or affected by a particular action or matter." 32 Cong. Rec. S14,270–01 (daily ed. Sept. 30, 1986). Following this legislative intent, the Second Circuit in *Carney v. Department of Justice* rejected as "not realistic" the agency's position that a requester needed to disseminate the information to "a large cross-section of the public." 19 F.3d 807, 814 (2d Cir.1994). The court found it sufficiently "public" that the plaintiff, a doctoral student in political

---

**2.** Many courts choose to model their analysis on the implementing agency regulation, where the regulation elaborates on the statute. *See, e.g., Schulz v. Hughes*, 250 F.Supp.2d 470 (E.D.Pa.2003) 28 C.F.R. § 16.11(k)(2); *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1126 (D.C.Cir.2004) (hereinafter cited as *"Judicial Watch 2004"*) (Department of Justice's implementing regulation); *VoteHemp v. Drug Enforcement Admin.*, 237 F.Supp.2d 55, 59–64 (D.D.C.2002) (Drug Enforcement Administration's implementing regulation, 28 C.F.R. § 16.11(k)(1)); *Judicial Watch 2003*, 326 F.3d at 1312 (Internal Revenue Service's implementing regulation, 26 C.F.R. § 601.702(f)(2)(ii)). HUD's implementing regulation, 24 C.F.R. § 15.110(h), merely restates the statutory provision. Thus, it provides no particular guidance for the instant case.

The parties cite *Schulz* and *Judicial Watch 2004* as models for my analysis. (*See* Def.'s Mot. for Summ. J. at 10 *and* Pl.'s Mot. for Summ. J. at 9.) I decline to adopt their proposal. First, *Schulz* and *Judicial Watch 2004* are based upon the Department of Justice's implementing regulation, which differs significantly from HUD's implementing regulation. *Compare* 28 C.F.R. § 16.11(k)(2) *with* 24 C.F.R. § 15.110(h). Secondly, I note that the validity of the Department of Justice's regulation has been challenged in at least one case. *See Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86 (D.C.Cir.1986) (plaintiff arguing that Department of Justice regulation violated FOIA on its face). Thirdly, I note that at least one court has criticized the Department of Justice's interpretation of this regulation as "unduly restrictive." *See Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 814 (2d Cir.1994). Thus, it does not seem appropriate to import the language of the Department of Justice regulation. Because I find that the Tenth Circuit's approach in *Forest Guardians* is clear and adheres more closely to the plain terms of the statute, I will adopt that approach.

science, planned to publish his dissertation and write scholarly articles. *Id.* at 815. As the court noted, "[s]uch work by its nature usually will not reach a general audience, but, by enlightening interested scholars, it often is of great benefit to the public at large." *Id.* at 814.

As in *Carney*, CLS's work by its nature is unlikely to reach a very general audience, but there is a segment of the public interested in its work. CLS claims that a reasonably large segment of Philadelphia's low- and moderate-income families would be interested in the information sought, including "almost any of the individual cases CLS's Public Housing Unit handled in 2004." (CLS Supp. Info., Admin. R. at 17.) Given the broad scope of the MTW Program and the changes PHA has already made, CLS's claim appears likely to be correct.

### B. Ability to disseminate information

■ Under the liberal construction Congress intended, a requester must show the capacity to reach a reasonably broad segment of the interested public.[3] In *Carney*, the Second Circuit was satisfied by the requester's allegation that he would use the information in tentatively planned scholarly works. 19 F.3d at 814–15. Because the requester was a serious and qualified scholar, the court found that his work was "likely to be considered by other scholars," despite his lack of any concrete plans for publication. *Id.* Similarly, in *Forest Guardians*, the Tenth Circuit was satisfied that the requester, a non-profit organization, published an online newsletter and intended to establish a website containing the requested information. 416 F.3d at 1180. In *Judicial Watch, Inc. v. U.S. Department of Justice*, 185 F.Supp.2d 54 (D.D.C.2002) (hereinafter *"Judicial Watch 2002"*), the D.C. Circuit found it sufficient that the requester, a non-profit organization, named "several mechanisms" for disseminating information, including "allowing reporters to inspect its documents, 'blast faxing' press releases, maintaining a website and appearing on radio and television programs." *Id.* at 62.

Although CLS may not have quite as extensive a capacity to disseminate information as in *Forest Guardians* and *Judicial Watch 2002*, it has shown the ability to reach a reasonably broad segment of the interested public. Like *Carney*, CLS argues that its ability to disseminate information would be "enhanced" by its respected reputation in the public and private sector. (CLS Supp. Info., Admin. R. at 18.) CLS states that it is "known in the local legal community as the *only* place to send people for legal advice and services concerning public housing and Section 8." (CLS's Appeal, Admin. R. at 38 (emphasis in original); *see also* CLS's

---

**3.** HUD faults CLS for failing to "put forth a concrete plan to disseminate the requested ... information to anyone other than its clients" and others who seek CLS's assistance. (Def.'s Mot. for Summ. J. at 13.) Specifically, HUD believes that CLS should have specified: how many of its clients are actual PHA tenants; how large a percentage of the PHA's total tenant population would have access to the information; how many persons its group clients, such as the Tenant Action Group, would inform; how often CLS's website is visited; how CLS would synthesize the information it received for public use; and

whether it has access to the media for purposes of disseminating information unrelated to a lawsuit. (*Id.* at 12–14.) Courts do not agree. It is significant that neither *Carney, Forest Guardians,* nor *Judicial Watch 2002* required the type of hard, detailed numbers that HUD demanded. None of these courts required a "concrete," "particularized" plan to disseminate information, but merely a showing of intent and general capacity to do so. Nor did the court in *Judicial Watch 2002* require media access on demand, but merely past access to media outlets.

Supp. Info., Admin. R. at 18.) CLS receives referrals from a wide range of sources, from the Philadelphia Bar Association to judges to PHA itself. (*See* CLS's Supp. Info., Admin. R. at 18, 29.) As in *Carney*, CLS's stature in its field tends to make it more likely that the interested public would pay attention to the information it disseminates.

Furthermore, CLS's client group is not "narrow," as HUD claims. CLS's Housing Unit advises and represents approximately 1,200 families annually in new cases, in addition to its still-active cases from previous years. (CLS Supp. Info., Admin. R. at 17; CLS Appeal, Admin. R. at 37.) CLS also undertakes representation for "group tenants" who advocate on public and subsidized housing issues and in class action lawsuits. (*Id.* at 17–18.) CLS estimates that it is likely to consult with roughly ten percent (approximately 7,200 individuals) of the PHA's tenants and voucher participants over a given two-year period. (*Id.* at 40.) Thus, CLS's client group appears to encompass a reasonably broad segment of the interested population.

Furthermore, CLS has multiple mechanisms for disseminating the requested information in addition to its legal practice. These means include: "[p]reparing and disseminating leaflets and brochures; [c]ommunicating with members of the news media who are likely to publish; [c]ommunicating with public officials who are interested in the welfare of PHA tenants and Section 8 participants"; and giving public housing law trainings to hun-

dreds of attorneys, judges, non-profit agency staff, and social workers every year. (*See* CLS FOIA Req., Admin. R. at 5; CLS Appeal, Admin. R. at 38, 42.) Further, CLS maintains a website through which it "inform[s] members of the interested public about [its] services and about their legal rights." (CLS Supp. Info., Admin. R. at 18.) The website's informative links and community education section support CLS's contention that it is an established community resource.[4] Thus, as in *Forest Guardians* and *Judicial Watch 2002*, CLS has described multiple means of dissemination.

In sum, CLS has shown that it is a respected source of information in its field, that its litigation and counseling activities reach more than a narrow segment of the interested public, and that it has multiple means for disseminating information. As a result, I find that the requested information is likely to contribute to public understanding.

## 2. Significance of contribution to public understanding

To qualify for a fee waiver, a requester must further show that the contribution to public understanding of government is likely to be "significant." 5 U.S.C. § 552(4)(A)(iii). Neither the statutory language nor HUD's implementing regulation, 24 C.F.R. § 15.110(h), provide any guidance as to what constitutes a "significant" contribution.

The first task is to decide what kind of contribution the information will make.

---

4. In its submissions to HUD, CLS provided a printout of its homepage, which contained a "Community Ed" link, as well as front-page links to articles about a recent Pennsylvania Supreme Court decision and a Question and Answer sheet about the Older Adults Protective Services Act. (CLS Supp. Info., Admin. R. at 22.) CLS also attached a printout of the

website's "Community Education" page, which contained links to eighteen information sheets or resources, such as "Public Benefits Consequences of Criminal Convictions in Pennsylvania" and a "Workers' Rights Handbook for Immigrant Workers" in English and Spanish. (*Id.* at 24.)

CLS notes that PHA has made major changes to its programs under the auspices of the MTW Program. (*See* CLS FOIA Req., Admin. R. at 4–5; CLS Appeal, Admin. R. at 36.) The requested information could plausibly shed light on whether PHA has the necessary authority to make these changes, what role HUD has played, and whether the MTW Program in practice serves the public interest.[5] Even if no impropriety is eventually found, the public is likely to benefit from this information. *See, e.g., Judicial Watch 2003,* 326 F.3d at 1314 ("the American people have as much interest in knowing that key [agency] decisions are free from the taint of conflict of interest as they have in discovering that they are not").

### A. Current availability of information

Under the "significance" factor, some courts consider to what degree the requested information is already available.[6] Ready accessibility would tend to make the potential contribution of disclosure less significant than otherwise. *See, e.g., Judicial Watch 2003,* 326 F.3d at 1314–15 (D.C.Cir.2003); *Ettlinger,* 596 F.Supp. at 877 (D.Mass.1984).

This factor weighs in favor of CLS's request for a fee waiver. Although PHA has publicized some aspects of the MTW Program, CLS states that PHA has failed to provide timely, detailed information about the Program to the public. (CLS FOIA Req., Admin. R. at 5.) CLS surveyed local newspapers, for example, and found little information from PHA or HUD about the MTW program. (*Id.*) HUD makes no claim that the information sought is readily available.[7] Thus, CLS's FOIA request appears likely to uncover information that would be unavailable otherwise.

### B. Newness of the information sought

In assessing significance, some courts also consider the newness of the information sought.[8] If the information were so outdated as to lose its currency or relevance, this fact might detract from the significance of its contribution to public understanding. *See, e.g., Forest Guardians,* 416 F.3d at 1180.

This factor also weighs in favor of CLS's fee waiver. In *Forest Guardians,* the requesters sought documents relating to the Bureau of Land Management's policy of allowing the collateralization of grazing permits. 416 F.3d at 1180. The Tenth Circuit found that although the existence of the policy was well-known, the details of the policy in practice were not. *Id.* Thus, the requested information "not only confirm[ed] previously released information on the existence of the ... [agency] program, but clarifie[d] its scope." *Id.* Similarly, although the public may know of the

---

5. HUD argues that the information's sole contribution to public understanding would be in helping the public to understand their "basic" MTW Program rights and responsibilities. (Def's Mot. for Summ. J. at 15.) HUD's view ignores the larger issues surrounding the MTW Program.

6. In *Judicial Watch 2003* and *Ettlinger,* the courts took their cue from the implementing agency regulation. Consideration of the availability of information appears sound as a matter of course, even though HUD's regulation does not require it.

7. HUD argues generally that PHA's publicization of its MTW Program weighs against CLS's fee waiver, but does not specifically allege that any of the twenty-four requested documents are already publicly available. (*See* Def.'s Mem. in Opp. to Pl.'s Mot. at 8.)

8. I consider this factor as it bears upon the significance of potential disclosure. However, this factor is not required by the statute or the applicable regulation.

existence of the MTW Agreement and PHA's MTW Program, the documents sought by CLS would clarify important facts about both. Thus, as in *Forest Guardians*, the CLS request would likely shed light on information that is new to the interested public.

## C. Pretext for discovery?

HUD correctly points out that "[t]he FOIA is not to be used as a substitute for the traditional means of discovery available to a litigant." *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1287 (9th Cir.1987) (internal citations omitted); *see John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 153, 110 S.Ct. 471, 107 L.Ed.2d 462 (1989). In *McClellan*, individuals with pending tort claims against the Air Force relating to toxic waste disposal sought documents relating to water pollution at an Air Force base. 835 F.2d at 1283, 1287. The requesters made "conclusory" statements about the public benefit of their use of the information in litigation and refused to clarify the relationship between their FOIA request and their private claims. *Id.* at 1285. The Ninth Circuit upheld the agency's denial of a fee waiver, stating its concern that the FOIA request was merely a discovery tool in disguise. *Id.*

In contrast, in *Pederson v. Resolution Trust Corp.*, 847 F.Supp. 851 (D.Colo. 1994), the requesters were former employees of the defendant agency. *Id.* at 853. As whistleblowers, the requesters sought documents relating to waste and abuse resulting from the agency's internal reorganization. *Id.* At the time of their FOIA request, the requesters had pending administrative grievances and EEO actions relating to their employment. *Id.* at 856. Nonetheless, "in light of the public interest in [the defendant agency's] mismanagement," the court declined to find that the

requesters' personal interests undercut the public interest component of their FOIA request. *Id.*

Unlike *McClellan* and *Pederson*, CLS does not have any pending claims relating to the information sought. HUD nonetheless infers that CLS's request is "in lieu of formal discovery, to benefit CLS's various litigation efforts," because of CLS's alleged failure to "demonstrate an intent to synthesize and present the . . . information into a more publicly usable form," a claim I discuss below. (Def.'s Mot. for Summ. J. at 15–16 (internal citations omitted).) HUD also argues that CLS's use of the information in advising clients suggests a litigious motive. (*Id.*) HUD cites as further proof CLS's claim that nearly all of its clients could be affected by PHA's MTW programs. (*Id.*)

If anything, these facts help to establish a non-litigation public interest in the information, given that CLS's services include counseling as well as litigation. (*See* CLS FOIA Req., Admin. R. at 4–5.) Where there is no evidence of a relevant lawsuit against HUD or PHA, HUD's inference of pretext seems speculative. Under HUD's position, it would be extremely difficult for any public interest law firm to obtain a fee waiver unless it requested information unrelated to its areas of practice and expertise. This result seems perverse and contrary to the legislative intent to construe the fee waiver liberally in favor of noncommercial requesters.

■ Furthermore, as the court in *McClellan* noted, "[t]he mere possibility of private lawsuits does not justify an agency in refusing to waive fees: public interest may be at peak precisely when there is potential for private lawsuits against the government." *Id.* at 1287 n. 4. Unlike the requesters in *McClellan*, CLS is not seeking recovery for private injuries. As in *Pederson*, CLS's litigation interest, if any,

would lie in exposing and redressing government wrongdoing. Given that government reform is inherently a matter of public interest, the specter of future litigation in this case tends to support, rather than defeat, CLS's entitlement to a fee waiver.

### D. Complexity of information and its synthesis by the requester

HUD also argues that CLS failed to show how the "extremely complex" information would benefit the public. (Def.'s Mot. for Summ. J. at 15.) It is unclear whether the information requested is in fact "extremely complex." CLS's twenty-four requests deal with, *inter alia,* reports, financial statements, policy statements, rent default notices, Resident Service and Satisfaction Surveys, annual audits, performance assessments, proposals, lease forms, and correspondence. (*See* CLS FOIA Req., Admin. R. at 3.) Comprehensiveness does not equal complexity. On their face, these documents do not appear unduly complex, and the record does not reflect any evidence of complexity.

HUD incorrectly contends that CLS did not "demonstrate an intent to synthesize and present the … raw … information into a more publicly useable form." (Def.'s Mot. for Summ. J. at 16 (internal citations omitted).) CLS stated that it would serve the interested public as "an independent source … with the sophistication needed to evaluate the information well." (CLS Supp. Info., Admin. R. at 18.) CLS's past experience in community education (*i.e.,* trainings, pamphlets, website) tends to support its claim. (*See* CLS FOIA Req., Admin. R. at 5; CLS Supp. Info., Admin. R. at 18; CLS Appeal, Admin. R. at 38, 42.) In *Eagle v. Department of Commerce,* No. C0120591–JF(PVT), 2003 WL 21402534 (N.D.Cal. April 28, 2003), the court granted a fee waiver to a requester whose project was "to review, synthesize, and supplement the information to provide a resource that did not otherwise exist." *Id.* at *5. As in *Eagle,* CLS has shown both the intent and capacity to evaluate and synthesize the information for public benefit.[9]

## IV. Conclusion

CLS has adequately shown that it satisfies the statutory requirements for a fee waiver. Specifically, CLS has shown that disclosure of the requested documents is likely to contribute to public understanding, and that the contribution is likely to be significant.

### ORDER

**AND NOW,** this *19*th day of December, 2005, upon consideration of Defendant's Cross Motion for Summary Judgment (Docket No. 13), Plaintiff's Motion for Summary Judgment (Docket No. 14), Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment (Docket No. 15), and Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Docket No. 16), it is hereby **ORDERED** that the Plaintiff's Motion (Docket No. 14) is **GRANTED** and Defendant's Motion (Docket No. 13) is **DENIED.**

Defendant is hereby **ORDERED** to produce all records responsive to Plaintiff's July 23, 2004 request free of charge.

---

9. Although the requester in *Eagle* may have offered a more extensive plan to synthesize the information, CLS's plan appears adequately tailored to public need. Notably, CLS's request does not involve the scientific, technical data involved in *Eagle. See id.* at *1 (plaintiff requesting documents relating to the use of scientific information in annual quota-setting by national and regional fishery management bodies).